UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

PRO TEM PARTNERS, INC.,                )
    Plaintiff                              )
                                           )
V.                                     ) Civil Action No. 1:05-cv-11822
                                           )
SEMICO RESEARCH CORPORATION            )
    Defendant                              )
                                           )

AFFIDAVIT OF JAMES FELDHAN IN SUPPORT OF
DEFENDANT SEMICO RESEARCH CORP.'S  MOTION TO DISMISS

I, JAMES FELDHAN. upon oath depose and say as follows:

1. I am the President of Semico Research Corp. (hereinafter "Semico"), and one of the original two founders.  I have resided in Arizona since prior to 1995.  My office is located at 1600 E Northern Avenue #255, Phoenix, Arizona.

*The interrelationship among Fine, Pro Tem and Semico*

2. Semico was established as an Arizona corporation effective February 3, 1995. Attached as **Exhibit 1** are the Arizona Corporation Commission's February 3, 1995 letter and Semico's Articles of Incorporation.  Jan-Charles Fine (hereinafter sometimes referred to as "Fine") was one of the two Incorporators.  The Articles of Incorporation were prepared and signed in Arizona.  The Articles of Incorporation appointed two persons as Semico's initial Board of Directors, one of whom was Fine.  Exhibit 1: Articles of Incorporation.   Fine also was

Page -1-

appointed as "Chief Executive Officer, Secretary and Treasurer" of Semico. Exhibit 1: Articles of Incorporation.

3. Fine also was one of the two original shareholders in Semico. Initially Fine's shareholdings represented one-third of all outstanding shares. A Shareholders' Agreement was prepared in Arizona and signed by both shareholders in Arizona in February 1995. A true copy of the Shareholders Agreement is attached as **Exhibit 2**.

4. Semico's original office was located at 1741 E Griswold Rd., Phoenix, AZ. Expansion required Semico to relocate its office and Semico moved to 7319 N 16th Street, Phoenix, AZ in 1996. In 2002, Semico moved to its current location at 1600 E Northern Ave #255, Phoenix, AZ. Presently Semico has 15 W-2 employees, 13 of whom work at Semico's Phoenix, AZ office, one who works in a home office in CA, and another one who works in a home office in WI.

5. Semico is a retail market research business. It concentrates on the semiconductor industry. It is engaged in the business of marketing analytical and consulting services to the semiconductor industry and affiliated industries. Semico prepares research reports that it retails to end user companies in the semiconductor industry, namely, semiconductor equipment suppliers, semiconductor material suppliers, original equipment manufacturers, contract manufacturers, and to financial and government entities. Many of the research reports are specially tailored to the needs of a particular customer. Semico also holds periodic conferences. These conferences have been held either in California or in Arizona, except for one that was held in Taiwan. No conferences ever have been held in Massachusetts.

6. Since its establishment in February 1995, most of Semico's Board of Directors meetings have been held at Semico's offices in Arizona. At least two meetings were held in

California. None of the meetings was held in Massachusetts. Once or twice Fine joined the Phoenix Board meeting via telephone.

7. All Stockholder meetings have been held at Semico's offices in Arizona. Since 1995 Fine has been in attendance at all of these meetings, with the exception of the Special Stockholders Meeting held January 26, 2005 for the purpose of removing Fine from the Board of Directors. Fine did not attend this meeting by his own decision.

8. Semico has no place of business in Massachusetts. Semico has no office outside Arizona. Semico has no telephone listing in Massachusetts. Semico has no property or other assets in Massachusetts

9. Semico's major customers are located in the States of Arizona, California, Texas, Oregon and North Carolina, and in the countries of Korea and Japan. In 2004, Semico only had four isolated sales to three customers in Massachusetts totaling approximately $33,000 in sales, out of Semico's total 2004 sales of $1,994,000.. The largest of the 2004 sales to a Massachusetts customer grew out of a meeting that occurred in California. I do not recall that any Semico employee has traveled to Massachusetts on business during either 2004 or 2005.

10. Semico maintains a web site for advertising, report sales, and client downloads, but relies primarily upon its employees and independent sales representatives to generate sales of its reports and services.

11. Upon its establishment in February 1995, Semico entered into a Sales Representative Agreement with Fine's company, Pro Tem Partners, Inc. Fine was the sole owner, officer and director of Pro Tem. Fine drafted the Agreement. The Agreement was signed in Arizona. The Agreement appointed Fine's company as an exclusive sales representative in some States and as

to some clients, and in later versions of the contract as a non-exclusive sales representative in some other countries, to market Semico's services.

12. From time to time, Fine elected to change the territories and clients that Pro Tem would service. In each case, Fine, still serving as Semico's Chief Executive Officer, Secretary, Treasurer and Director, would prepare a revised Sales Representative Agreement, which he submitted to me, Semico's other officer, for signature, and then Fine signed on behalf of Pro Tem. At all times I worked at Semico's Arizona offices. The last Sales Representative Agreement that Fine drafted is dated March 31, 2004. True copies of the October 2000 and March 31, 2004 Sales Agreements are attached as **Exhibit 3A and 3B**.

13. Under Pro Tem's last Sales Representative Agreement, drafted by Fine in March 31 2004 while he still was Chief Executive Officer of Semico, Pro Tem's territory was designated as

> "all customer sites within the Canadian Provinces of Ontario, Quebec and N[ew] B[runswick], and the New England, Middle Atlantic and Southeastern regions extending until South Carolina, of the United States . . . ."

In the Agreement Fine also appointed Pro Tem as exclusive sales representatives of the following three companies:

> \> PartMiner, Inc., whose world headquarters are in Melville, NY;
> \> Thompson Financial / First Call whose U.S. headquarters are in Connecticut; and
> \> Semiconductor Investment Partners LLC whose office is in Denver, Colorado. Fine was trying to organize this company, but that did not materialize. Exhibit 3.

14. Until he resigned on January 25, 2005, Fine continued to serve as Semico's Chief Executive Officer, Treasurer and Secretary. Fine also continued to serve as one of Semico's two Directors. Fine had a Semico credit/debit card, and was an authorized signer for company

checks.  Fine also had company checks in his possession.

*Events leading up to the present Lawsuit*

15.  Fine attended the Semico Board of Directors Meeting held at Semico's Nano

Conference, in San Jose, California in early November 2004.  Shortly following that meeting,

Fine sent a letter to me, as Director/President of Semico, dated November 9, 2004, advising that

he intended to pursue dissolution of Semico unless I agreed to one of three proposals set forth in

the letter, namely:

> One: Redefinition of the President's Responsibilities and Obligations to decrease the
> President's authority and increase Fine's oversight authority;
> Two:  The present President assume the position of "Research President" and Semico
> hire a new individual to assume the administrative roles of the President; or
> Three:  Semico agree to buy back Fine's shares in Semico at the price offered by Fine.

A true copy of the November 9, 2004 letter is attached as **Exhibit 4**.

16.  I rejected Fine's proposals, and sought to prevent Fine from dissolving Semico.  To

that end, I called for a Special Stockholders Meeting,  at Semico's Phoenix, Arizona offices, to

vote on removing Fine and electing a new Director.  Fine hired the large Phoenix, AZ law firm

of Snell & Wilmer, to block the Special Stockholders Meeting.  Their efforts continued through

November and December 2004, and into January 2005.  They were successful in delaying the

meeting until late January 2005.

17.  In December, Fine's local Phoenix AZ counsel demanded an audit. Semico agreed,

and  it was scheduled for December 30, 2004.  Fine's Phoenix AZ counsel did not appear, and

later said they had sent a note advising that they would not be there.  No such note was ever

received at Semico.  Neither Fine nor his Phoenix AZ counsel sought to pursue an audit further.

18.  In the time preceding the Special Stockholders meeting, while Fine still was Chief Executive Officer, he engaged in conduct that was not consistent with Semico's best interests:

> Fine wanted Semico to hire a high-salary analyst to provide new consulting capabilities in the communication industry.  However, Fine refused to provide a list of customers and forecast to justify this new hire.

> Fine wanted Semico to hire a high-salary analyst to expand Semico's capabilities in the Semiconductor Equipment industry.  Again Fine refused to provide a list of customers and forecast to justify this new hire.

> Fine wanted me, as Semico's President, to fire three Semico employees, and Fine talked about the release of these employees to other Semico staff prior to any final decision.  In November 2004 I told Fine that he may get his wish; that these employees were considering leaving Semico.  Fine called into Semico and proceeded to tell the receptionist that "isn't it sad that Bob Merritt and Joanne Itow are leaving."  He then left me a voice message that said I needed to make an announcement about these two employees leaving, because rumors will begin to circulate.

19.  On the morning prior to the scheduled Special Stockholders Meeting, at Semico's Phoenix, Arizona offices, Fine submitted his resignation as Chief Executive Officer, by a letter dated January 25, 2005.  His resignation was accepted.

20.  At the Special Stockholders Meeting held at Semico's Phoenix, Arizona offices on January 26, 2005, the Stockholders unanimously voted to remove Fine and also voted in a new Director to replace Fine.  The new Board removed Fine as Secretary and Treasurer and assigned these duties to the new Director.  Fine's company, Pro Tem, remained a Sales Representative of Semico.

*Breakdown in the Relationship following Fine's resignation / removal from Semico*

21. Following Fine's resignation and removal from Semico and continuing into 2005, Fine periodically continued to complain about Semico's refusal to accede to his demands that Semico hire new analysts in new areas, but Fine continued to refuse to provide lists of customers and a forecast to justify any new hires.   On the other hand, following Fine's resignation and removal from Semico, information from Pro Tem regarding its sales efforts and sales plans evaporated.  Prior to his resignation and removal from Semico, information had flowed freely, and Fine and I also had scheduled and held periodic planning meetings at Semico's Phoenix AZ offices.   Now, however, for the most part communications as to what Pro Tem was doing consisted primarily of email requests and responses.  Semico did not know who Fine was prospecting. Fine failed and refused to comply with requests for information. even after repeated requests, and pointing out to him how critical this information is for Semico to manage employees, sales, revenue and profits.  The information also was needed for discussions with a possible acquiring company which, ironically, would have been advantageous to Fine as he is a substantial shareholder of Semico.

22. In recent years, Pro Tem's sales also had shown a marked decline.  In each of the years 2000, 2001 and 2002, Pro Tem was credited with sales of approximately $1.3 million.  Pro Tem was credited with sales of approximately $276,000 for 2003,  $259,000 for 2004 and $104,000 for 2005.  Although some of the decrease could be attributed to changes in general economic conditions, it appeared to me that Pro Tem was not proactively pursuing opportunities.

23. Before Fine's resignation and removal from Semico, one of the major disagreements between Fine and Semico about how Semico conducted its business was that Fine believed that Semico was being operated too much like a "mom and pop" operation.  Following the election of

a new Board of Directors and appointment of new Officers, and after internal discussions at Semico, Semico instituted some new policies to address this issue.

24. One of the new policies was adoption of Guidelines for its Sales Tracking and Monitoring. The Guidelines were sent on April 19, 2005 to all Semico employees involved in sales. Semico asked its own employees to increase sales by 40%. With the success of this program, the Guidelines were sent to Pro Tem on May 9, 2005. Semico asked Pro Tem to increase its sales by 20%, one-half of what it was asking of its own employees. Attached as **Exhibit 5** are true copies of the Guidelines and of the transmittal email to Fine.

25. After internal discussions at Semico concerning Pro Tem's poor performance and failure to communicate, in May 2005 Semico placed Pro Tem on a Sales Performance Improvement Plan. Semico outlined its areas of concern and Semico's expectations in the Plan. A central purpose of the Improvement Plan was to get a handle on what opportunities were available to Semico. The Plan was transmitted to Fine at the same time he was sent the Guidelines for Sales Tracking and Monitoring. A true copy of the Performance Improvement Plan is attached hereto as **Exhibit 6.**

26. One of the reasons for the Guidelines was to assure that renewals were not missed at existing customers. Semico was concerned about the support level to customers in Pro Tem's territory. The timely renewal at existing accounts was a continual issue. Because Pro Tem failed to do so, Semico's in-house Analysts had to remind Fine concerning renewals and had to contact long time customers such as IBM/Lenovo to accomplish renewals. After termination of the Agreement with Pro Tem, when IBM/Lenovo was notified of the change in sales coverage. they stated that they were not surprised as they had noted the slipping of

interest on the part of Pro Tem in servicing the account, and that Semico already had been doing much of the servicing.

27.  Additionally, Fine was unwilling to learn Semico products in order to sell them in his region.  All of the product information is available on Semico's website as Fine was informed of repeatedly.  Nevertheless, even for existing accounts, in spite of years of selling the same products, Fine required Analyst assistance.

28.  Since at least 2000, Corning, a client in New York, said that they would not do business with Semico if they had to work with Fine.  I became the sales person for that account.

29.  Another reason for the new Guidelines was to expand business and to have new potential customers contacted before scheduled sales trips and pre-meetings.  Pro Tem was failing to do this. The new accounts in the North Carolina area were always initiated by Analysts at Semico's Phoenix, Arizona office as Pro Tem was not being proactive in penetrating that portion of its territory..

30.  Pro Tem failed and refused to address the matters outlined in the Performance Improvement Plan or to follow the Guidelines.  The relationship between Semico and Pro Tem devolved into exchanges of complaints about each other.  Copies of the last two exchanges of letters between Semico and Pro Tem are attached hereto as **Exhibits 7A (6/29/2005 Fine to Feldhan), 7B (7/6/2005 Feldhan to Fine), 7C (7/13/2005 Fine to Feldhan) and 7D ( 7/20/2005 Feldhan to Fine).**

*Pro Tem's Expense Reports (Complaint ¶ 5)*

31.  Semico has an expense report form which has lines for signatures for the person who filled out the expense form and for approval by Semico. Until his resignation, Fine signed his

ProTem expense reports and then approved them himself in his capacity as Chief Executive Officer of Semico, and sent them directly to Semico's bookkeeper for payment.

32. After Fine resigned as Chief Executive Officer and he was removed from the Board of Directors and as Secretary and Treasurer in late January 2005, Fine was informed orally and in writing, as the sole representative of ProTem, that he was to report to me, the President of Semico, that I was to be his sole point of contact within Semico, and that all communications must go through me.

33. The expense report for the North Carolina trip referred to in Paragraph 5 of the Complaint was never sent to me for approval. When Fine inquired of me why he had not received a check for his expenses, I asked if the expense report had been sent to me and Fine said "no". I asked that Fine send the expense report to me, as President, as previously he had been told to do, for approval.

34. Fine subsequently sent an unsigned copy of the expense report. I mailed the expense report back to Fine via first class mail for signature, as has always been Semico's company policy. After receiving a signed copy of the expense report from Fine, a check was promptly written and mailed to him. Fine complained that Semico should have called Fine about the unsigned expense report and he would have been able to fax a copy. I informed Fine that Semico requires original signatures.

*The alleged interference with Pro Tem's Sales Efforts (Complaint ¶ 9, 14).*

35. Semico has not engaged in tactics to restrict ProTem's sales efforts. In fact Semico has gone beyond its normal efforts to help support ProTem.

36. The 2004 North Carolina sales trip is but one recent example of many. Sherry Garber a Sr. Vice President, Director, Secretary and Treasurer of Semico rearranged her schedule to meet Fine in North Carolina on short notice to support Fine's sales efforts. Normally Semico requires two weeks to make airline reservations, in order to save on travel cost. In this case, Semico made an exception in order to support Fine. In 2003, Fine refused to go to North Carolina. Garber made the trip by herself to renew IBM as an ongoing account as well as to make a sale to a new client, DuPont, a company that Fine said was not worth visiting as they would not buy anything. Fine still received his commissions.

*Pro Tem's Breach of its Agreement*

37. ProTem's contract was terminated because it continued to breach the following provisions of his contract that allowed for ProTem's immediate termination:

Section 3.01. Semico shall exercise no control over the manner and method by which The Representative's business is conducted. **Representative shall act in the best interests of Semico**.

Section 3.06. Failure of The Representative to comply with Sections 3.01 through 3.05 shall constitute **a breach of This Agreement and as such, shall cause the immediate termination** of this Agreement with the written notice required in Article VIII of this Agreement. [Emphasis supplied.]

38. As stated above, prior to Fine resigning from Semico, Fine participated in planning meetings held at Semico's Phoenix AZ offices, which included reporting on Pro Tem's customer feedback and Pro Tem's sales efforts. After his resignation in January 2005, Fine refused to provide (a) a sales forecast for Pro Tem's territory or (b) information about potential customers and sales. Fine also was aware that there is a company interested in purchasing Semico. The

potential suitor requested detailed forecasts. Fine refused to contribute to this effort. During the sales trip in North Carolina with Sherry Garber, Fine told Garber that the deal with the potential suitor would not go through without Fine's help. Despite repeated pleas to provide information that would help Semico, Fine consistently refused.

39. Pro Tem was in breach of the following terms of the Agreement:

**Section 3.05.** The Representative shall offer Semico services only at prices and on terms and conditions of sale established by Semico and shall **abide by the Company's policies in all matters relating to Semico and its products.**

**Section 3.06.** Failure of The Representative to comply with Sections 3.01 through 3.05 shall constitute a **breach of This Agreement and as such, shall cause the immediate termination** of this Agreement with the written notice required in Article VIII of this Agreement. [Emphasis supplied].

40. Semico established a Sales Performance Improvement Plan to improve the sales of Semico. This was a company policy. Fine refused to abide by the Company's policy.

41. Fine was informed that he reported to me, as President, and that the President was his sole contact. Fine repeatedly contacted other individuals, against company policy, and also did not keep me informed of the communications. Pro Tem also only provided "snippets" of information to Semico regarding customers and potential customers.

42. Communication from Fine to me was sparse and deficient; Garber reported to me that Fine told her that he would never talk to me again.

*Alleged forced sale of Fine's Semico stock (Complaint ¶ 14)*

43. On November 4, 2004 at the Board of Directors meeting, Fine said he wanted to be bought out.

44.  Fine's November 9, 2004 letter states that he wanted to be bought out.  Exhibit 4.

45.  Garber reported to me that Fine repeatedly told her in telephone calls over several months that he wanted to be bought out.

46.  Garber reported to me that during her trip in North Carolina with Fine, Fine told Garber that he wanted to be bought out.

47.  Fine had signed a Stockholders Agreement that states that any stock purchase would be paid with 10% down and the balance paid over 10 years.  Exhibit 2.  In April 2005, Semico offered to waive that payment term and to pay Fine a lump sum, in consideration of Fine agreeing to termination of the Semico/Pro Tem contract.

48.  Semico entertained an offer, but negotiations to buy Fine's stock ended because it appeared that both parties were far apart on price. Subsequently after a June 2005 phone conversation between Fine and me, wherein I asked  Fine why he had not responded to my attorney's inquiry to Fine's Phoenix, AZ counsel back in December 2004 as to what Fine wanted for a buyout,  Fine stated  that his attorney never relayed that information to him. Fine then proposed to pay for one-half the cost of an appraisal of the value of his shares provided that Semico or I agree to some stipulations.  However, the matter was never pursued..


The foregoing Affidavit is made and given under the pains and penalties of perjury this
_16_ day of December 2005.

James Feldhan


## NOTARY JURAT CERTIFICATE

STATE OF ARIZONA          )

MARICOPA COUNTY        )

On this __16__ day of December, 2005, before me, the undersigned notary public, personally appeared JIM FELDHAN, proved to me through satisfactory evidence of identification, which were [X] State Driver's License [ ] Personal Knowledge, to be the person whose name is signed on the preceding or attached document, and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of his knowledge and belief.

[S E A L]

_____
                                        Notary
Public



LYNN K. KNOELL
Notary Public - Arizona
Maricopa County
My Commission Expires
March 24, 2006

**RENZ D. JENNINGS**
CHAIRMAN

**MARCIA WEEKS**
COMMISSIONER

**CARL J. KUNASEK**
COMMISSIONER

**JAMES MATTHEWS**
EXECUTIVE SECRETARY

## ARIZONA CORPORATION COMMISSION

*February 3, 1995*

SEMICO RESEARCH CORP.

We are pleased to notify you that your Articles of Incorporation were filed on _____*February 3, 1995*_____.

You must publish a copy of your Articles of Incorporation WITHIN SIXTY (60) DAYS from the File Date. The publication must be in a newspaper of general circulation in_____*MARICOPA*_____ County, for three (3) consecutive publications. An affidavit from the newspaper, evidencing such publication, must be delivered to the Commission for filing WITHIN NINETY (90) DAYS from the File Date.

All corporations transacting business in Arizona are required to file an Annual Report with the Commission, no later than the 15th day of the fourth (4th) month following the close of each fiscal year. Your fiscal year end is_____*December 31, 1995*_____.
Each year, a preprinted Annual Report Form will be mailed to you during that month.

**Your first annual report will be due**_____*April 15, 1996*_____.

If you have any questions or need further information, please contact us at (602) 542-3135 or Toll Free (Arizona residents only) at 1-800-345-5819.

Very truly yours,

*Esther Thomas*
Examiner
Corporations Division
Arizona Corporation Commission

CF:04
Rev:1/95

1200 WEST WASHINGTON, PHOENIX, ARIZONA 85007 / 400 WEST CONGRESS STREET, TUCSON, ARIZONA 85701

LEWIS & ROCA          T__:602-262-5747          Feb   95    13:24 No.007 P.04

STATE OF ARIZONA
ACC/FAX
DATE FILED

FEB 0 3 1995

## ARTICLES OF INCORPORATION
## OF
## SEMICO RESEARCH CORP.

DATE APPR   2-3-95
TERM
BY _Heather Thomas_
074054 7-4

OK/MF

1.    <u>Name</u>.  The name of the corporation is Semico Research Corp.

2.    <u>Purpose</u>.  The purpose for which the corporation is organized is the transaction of any or all lawful business for which corporations may be incorporated under the laws of Arizona.

3.    <u>Initial Business</u>.  The corporation initially intends to operate a market research business.

4.    <u>Authorized Shares</u>.  The corporation has authority to issue 1,000,000 common shares, par value $0.001 per share.  The board of directors may divide any or all classes into series, and may fix and determine the designations, preferences, privileges and voting powers, and the restrictions and qualifications thereof, of the shares of each series so established.

5.    <u>Statutory Agent</u>.  The name and address of the initial statutory agent is L and R Service Co., 40 North Central Avenue, Suite 1500, Phoenix, Arizona 85004.

6.    <u>Board of Directors</u>.  Two directors shall constitute the initial board of directors.  The initial directors and their addresses are:

Jim Feldhan
1741 East Griswold Road
Phoenix, Arizona 85020

Jan-Charles Fine
106 Benvenue Street
Wellesley, MA 02181

Hereafter, the Bylaws shall establish the number of directors.

6.1    <u>Officers</u>.  The officers, who serve at the pleasure of the board of directors, are:

Jim Feldhan                  President and Vice President
Jan-Charles Fine             Chief Executive Officer, Secretary
                             and Treasurer

ACC222RS

7. Incorporators. The incorporators of the corporation and their addresses are:

Jim Feldhan
1741 East Griswold Road
Phoenix, Arizona 85020

Jan-Charles Fine
106 Benvenue Street
Wellesley, MA 02181

8. Indemnification. The corporation shall indemnify each of its directors and officers to the fullest extent permissible (a) under the provisions of A.R.S. § 10-005, (b) under indemnification provisions of any successor amended statute, (c) as provided in the Bylaws of the corporation; or (d) by any agreement adopted pursuant to the provisions of A.R.S. § 10-005.

9. Director Liability. A director of this corporation shall not be personally liable to the corporation or its shareholders for monetary damages for breach of fiduciary duty as a director. This article shall not eliminate or limit the liability of a director for any conduct described in clauses (a) through (e) of section 10-054.A.9, Arizona Revised Statutes. If the Arizona Corporation Law is amended to authorize further elimination or limitation of the liability of a director, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the Arizona Corporation Law as so amended. Any repeal or modification of this article shall not increase the liability of a director of the corporation arising out of acts or omissions occurring before the repeal or modification becomes effective.

10. Distributions from Capital Surplus. The board of directors may, from time to time, distribute a portion of the assets of the corporation to its shareholders out of the capital surplus of the corporation, in cash or property.

11. Repurchase of Shares. The board of directors may cause the corporation to purchase its own shares to the extent of the unreserved and unrestricted earned and capital surplus of the corporation.

EXECUTED _2/3_, 1995.

_Jim Feldhan_

Jim Feldhan

Jan-Charles Fine

2

AOC22285

From                                                                                            P02

LIMIS & PHCA              TEL:602-262-5747              Feb 03 95   11:03 No.003 P.02

7.    **Incorporators**. The incorporators of the corporation and their addresses are:

Jim Feldhan
1741 East Griswold Road
Phoenix, Arizona 85020

Jan-Charles Fine
106 Benvenue Street
Wellesley, MA 02181

8.    **Indemnification**. The corporation shall indemnify each of its directors and officers to the fullest extent permissible (a) under the provisions of A.R.S. § 10-005, (b) under indemnification provisions of any successor amended statute, (c) as provided in the Bylaws of the corporation; or (d) by any agreement adopted pursuant to the provisions of A.R.S. § 10-005.

9.    **Director Liability**. A director of this corporation shall not be personally liable to the corporation or its shareholders for monetary damages for breach of fiduciary duty as a director. This article shall not eliminate or limit the liability of a director for any conduct described in clauses (a) through (e) of section 10-054.A.9, Arizona Revised Statutes. If the Arizona Corporation Law is amended to authorize further elimination or limitation of the liability of a director, then the liability of a director of the corporation shall be eliminated or limited to the fullest extent permitted by the Arizona Corporation Law as so amended. Any repeal or modification of this article shall not increase the liability of a director of the corporation arising out of acts or omissions occurring before the repeal or modification becomes effective.

10.    **Distributions from Capital Surplus**. The board of directors may, from time to time, distribute a portion of the assets of the corporation to its shareholders out of the capital surplus of the corporation, in cash or property.

11.    **Repurchase of Shares**. The board of directors may cause the corporation to purchase its own shares to the extent of the unreserved and unrestricted earned and capital surplus of the corporation.

EXECUTED _2/3_, 1995.

_____
Jim Feldhan

_____
Jan-Charles Fine

2

ACC22285

ACCEPTANCE OF APPOINTMENT
BY STATUTORY AGENT

The undersigned acknowledges and accepts the appointment as statutory agent of Semico Research Corp. effective Feb. 3, 1995.

L AND R SERVICE CO., an Arizona corporation

By _____
Assistant Secretary
40 North Central Avenue
Suite 1500
Phoenix, Arizona  85004

3

ACC22285

## ARIZONA CORPORATION COMMISSION
## CORPORATIONS DIVISION

Phoenix Address: 1200 West Washington
Phoenix, Arizona 85007

Tucson Address: 402 West Congress
Tucson, Arizona 85701

### CERTIFICATE OF DISCLOSURE
A.R.S. Sections 10-128 & 10-1084

PLEASE SEE REVERSE SIDE

SEMICO RESEARCH CORP.
EXACT CORPORATE NAME

CHECK APPROPRIATE BOX(ES) A or B
ANSWER "C"

THE UNDERSIGNED CERTIFY THAT:

A. No persons serving either by elections or appointment as officers, directors, incorporators and persons controlling, or holding more than 10% of the issued and outstanding common shares or 10% of any other proprietary, beneficial or membership interest in the corporation:
   [X]
   1. Have been convicted of a felony involving a transaction in securities, consumer fraud or antitrust in any state or federal jurisdiction within the seven-year period immediately preceding the execution of this Certificate.
   2. Have been convicted of a felony, the essential elements of which consisted of fraud, misrepresentation, theft by false pretenses, or restraining the trade or monopoly in any state or federal jurisdiction within the seven-year period immediately preceding the execution of this Certificate.
   3. Have been or are subject to an injunction, judgment, decree or permanent order of any state or federal court entered within the seven-year period immediately preceding the execution of this Certificate where such injunction, judgment, decree or permanent order:
      (a) Involved the violation of fraud or registration provisions of the securities laws of that jurisdiction; or
      (b) Involved the violation of the consumer fraud laws of that jurisdiction; or
      (c) Involved the violation of the antitrust or restraint of trade laws of that jurisdiction.

B. For any person or persons who have been or are subject to one or more of the statements in Items A.1 through A.3 above, the following information MUST be attached:
   [ ]
   1. Full name and prior name(s) used.
   2. Full birth name.
   3. Present home address.
   4. Prior addresses (for immediate preceding 7-year period).
   5. Date and location of birth.
   6. Social Security number.
   7. The nature and description of each conviction or judicial action, date and location, the court and public agency involved and file or cause number of case.

### STATEMENT OF BANKRUPTCY, RECEIVERSHIP OR REVOCATION
A.R.S. Sections 10-128.01 and 10-1083

C. Has any person serving (a) either by election or appointment as an officer, director, trustee or incorporator of the corporation or, (b) major stockholder possessing or controlling any proprietary, beneficial or membership interest in the corporation, served in any such capacity or held such interest in any corporation which has been placed in bankruptcy or receivership or had its charter revoked?    YES ___    NO  X

IF YOUR ANSWER TO THE ABOVE QUESTION IS "YES", YOU MUST ATTACH THE FOLLOWING INFORMATION FOR EACH CORPORATION:

1. Name and address of the corporation.
2. Full name, including alias and address of each person involved.
3. State(s) in which the corporation:
   (a) Was incorporated.
   (b) Has transacted business.
4. Dates of corporate operation.
5. A description of the bankruptcy, receivership or charter revocation, including the date, court or agency involved and the file or cause number of the case.

Under penalties of law, the undersigned incorporators/Officers declare that we have examined this Certificate, including any attachments, and to the best of our knowledge and belief it is true, correct and complete.

BY _____    DATE 2/3/95
TITLE   Incorporator

BY _____    DATE 2/3/95
TITLE   Incorporator

BY _____    DATE _____
TITLE _____

BY _____    DATE _____
TITLE _____

FISCAL DATE: December 31

Inc. 0001 - Domestic
Rev. 6/89

ATTACHMENT TO CERTIFICATE OF DISCLOSURE
OF
SEMICO RESEARCH CORP.

The undersigned is an officer, director, owner of 10% or more of the
stock or incorporator of the above corporation. It is possible that the
undersigned may have acted as incorporator, officer or director or been an owner
of 10% or more of the stock of a domestic or foreign corporation which may have
had its corporate existence terminated by charter revocation. The undersigned is
not presently aware of having been involved in any of those capacities with any
such corporation, but is not presently able to assert with certainty that such has
not been the case. The undersigned has not been involved with any corporation
in any such capacity which has subsequently, to the knowledge of the
undersigned, been involved in a bankruptcy or receivership proceeding, except as
may be noted by further attachment to this certificate of disclosure.

Date of Signing:                          Signature:

2/1/95

Jan-Charles Fine, Chief Executive Officer,
Secretary, Treasurer, Incorporator and
Director

ACC22289

## SHAREHOLDERS AGREEMENT

1.    Parties.  This Agreement is between Semico Research Corp., an Arizona corporation (Corporation), and its shareholders listed on Exhibit A (Shareholders).  Corporation and Shareholders agree as follows:

2.    Recitals.

2.1    Business of Corporation.  Corporation operates a market research business.

2.2    Share Ownership.  Shareholders own shares of Corporation's stock (Shares) in the amounts listed on Exhibit A. Shares held in the name of a Shareholder's family trust shall be subject to this Agreement as if they were held in the Shareholder's name.

2.3    Disposition of Shares.  Corporation and Shareholders believe it is in their interests to restrict the Shareholders' right to sell, transfer or convey Shares and to make provision for the future disposition of the Shares.

2.4    Purpose.  The purpose of this Agreement is to set forth the terms and conditions on which Shareholders or their successors may sell, assign, pledge, or otherwise transfer or encumber Shares.

3.    Transfer and Dilution Restrictions.

3.1    No Transfer of Shares.  No Shareholder shall sell, assign, pledge or otherwise transfer or encumber any interest in Shares without first offering such Shares to Corporation or its designees in accordance with the terms and conditions of this Agreement.

3.2    Equal Effect of Dilution.  Any sale by Corporation of its securities to Shareholders or any other person must be structured so that the holdings of the Shareholders remain proportionate (that is, if Shareholders A and B own shares in a 2:1 ratio before the offering, they must continue to own shares in the same ratio after the offering).  This requirement will be deemed met if the Shareholders are given the opportunity to participate pro-rata in a proposed transaction, even if one Shareholder declines to participate and that Shareholder's proportionate holding is changed as a result.  The Shareholders will not participate in any transaction or series of transactions with the Corporation or with purchasers of the Corporation's securities that would have the effect of evading this requirement

4.    Legend.  All Shares issued in the past, present or future to any Shareholder shall be subject to the terms of this Agreement. Any certificate for Shares issued to any Shareholder shall bear the following legend:

ACC2243E

"The shares evidenced by this certificate are subject to a Shareholders Agreement and may not be sold, assigned, pledged or otherwise transferred or encumbered except in accordance with its terms. Within 5 days after receipt of a written request, Corporation will mail to any Shareholder a copy of such Agreement."

Any certificates presently outstanding shall be deemed to bear the legend upon the execution of this Agreement, and the Shareholders shall surrender to Corporation such certificates for the purpose of affixing the legend. Corporation shall not accept for transfer any Shares subject to this Agreement or bearing the legend unless it receives satisfactory evidence of compliance with the terms of this Agreement.

5.  <u>Sales of Shares to Third Persons</u>. If any Shareholder desires to sell, assign or transfer some or all Shares held in the Shareholder's name, the selling Shareholder shall, prior to selling such Shares to any other purchaser offer in writing to sell them to Corporation or its designees (1) at a mutually agreed price and on mutually agreed terms, (2) at the same price and terms as offered in a bona fide written offer made by a responsible proposed purchaser, or (3) at the Fixed Value of the Shares. The written offer of the selling Shareholder to Corporation or its designees shall identify the proposed purchaser and the price and terms of the proposed purchaser's offer. Corporation or its designees shall have 30 days from receipt of the offer or, if Corporation or its designees request a determination of Fixed Value within such period, 10 days from receipt of notice of the Fixed Value to choose the price and to exercise the option to purchase all, but not less than all, Shares offered by the selling Shareholder. If Corporation or its designees fail to exercise the option, the selling Shareholder may sell the Shares offered to Corporation or its designees only to the proposed purchaser disclosed in the selling Shareholder's initial offer letter and only within 60 days from the expiration of the option.

6.  <u>Purchase of Interest of Nonshareholder Spouse</u>. Upon dissolution of the marriage or the death of the spouse of any Shareholder of record and if, after the division of assets in connection with the dissolution of the marriage or the death, the former spouse or spouse's estate has any interest in the Shares held in the Shareholder's name, the interest of the former spouse or spouse's estate in such Shares shall be subject to mandatory sale.

6.1  <u>Acquisition by Shareholder</u>. The Shareholder shall have the right to purchase the interest in such Shares (1) at a mutually agreed price and upon mutually agreed terms or (2) at the Fixed Value of the Shareholder's Shares multiplied by the percentage interest held by the former spouse or spouse's estate. The Shareholder shall have 30 days from the date Corporation receives notice of the decree of dissolution or the death or, if the Shareholder requests a determination of Fixed Value within such period, 10 days from receipt

2

ACC2243E

of notice of the Fixed Value to choose the price and to exercise the option to purchase the interest in the Shares.

      6.2    Acquisition by Corporation. If the Shareholder does not exercise the option, Corporation or its designees shall have the option to purchase the interest of the former spouse at the same prices and on the same terms as were available to the Shareholder. Corporation or its designees shall have 30 days from the expiration of the Shareholder's option or, if the Shareholder did not request a determination of Fixed Value and Corporation or its designees request a determination of Fixed Value within such period, 10 days from receipt of notice of the Fixed Value to choose the price and to exercise the option to purchase the interest in the Shares.

      7.    Death of a Shareholder. Upon the death of any Shareholder, Corporation or its designees shall have the right to acquire all, but not less than all, of the Shares held in the deceased Shareholder's name at the time of death (1) at a mutually agreed price and on mutually agreed terms or (2) at the Fixed Value of the Shares. Corporation or its designees shall have 60 days from receipt of notice of the death or, if Corporation or its designees request a determination of Fixed Value within such period, 10 days from receipt of notice of the Fixed Value to choose the price and to exercise the option to purchase the Shares.

      8.    Termination of Employment. If a Shareholder is employed by Corporation and such employment is terminated for any reason other than death, Corporation or its designees shall have the right to purchase all or some of the Shares held in the Shareholder's name (1) at a mutually agreed price and on mutually agreed terms or (2) at the Fixed Value of the Shares. Corporation or its designees shall have 30 days from the termination of employment or, if Corporation or its designees request a determination of Fixed Value within such period, 10 days from receipt of notice of the Fixed Value to choose the price and to exercise the option to purchase the Shares.

      9.    Involuntary Transfer. If a Shareholder's Shares are involuntarily transferred for any reason, including but not limited to bankruptcy or attachment by a judgment creditor, Corporation or its designees shall have the right to purchase all or some of the Shares formerly held in the Shareholder's name (1) at a mutually agreed price and on mutually agreed terms or (2) at the Fixed Value of the Shares. Corporation or its designees shall have 30 days from receipt of notice of such transfer or, if Corporation or its designees request a determination of Fixed Value within such period, 10 days from receipt of notice of the Fixed Value to choose the price and to exercise the option to purchase the Shares.

      10.    Fixed Value. The Fixed Value of Shares shall be determined in the following manner:

ACC2243E

10.1     Agreed Fixed Value. At the annual meeting of the Directors of Corporation, or more frequently if the Shareholders agree, the board of directors shall meet for the purpose of agreeing on the Fixed Value. The Fixed Value and the method for its determination shall be agreed by a two-thirds majority of the Directors, written, dated and placed in the minute book of Corporation. The Fixed Value as agreed shall be effective for 15 months after the date of the writing, unless superseded by a subsequent agreed Fixed Value.

10.2     Appraised Fixed Value. If the Directors have not set a Fixed Value within 15 months, Corporation's independent public accountant shall determine the Fixed Value as of the date of the request for a determination of Fixed Value. In determining the Fixed Value of Shares, the accountant shall take into consideration the book value of the assets of Corporation at the end of the most recently completed Fiscal Year, the value of the business as an operating enterprise, significant changes in Corporation's assets or their value, an appropriate discount or bonus to reflect the lesser or greater value of an interest in the business less than the whole, and such other factors as the accountant considers appropriate. The accountant shall determine the Fixed Value as promptly as possible after a request for its determination and shall then notify Corporation and the proposed Buyer(s) and Seller(s) of the Fixed Value.

10.3     Payment for Determining Fixed Value. If a determination of Fixed Value is requested under this Agreement, the proposed Buyer(s) shall pay equally one-half of the fees and costs of the accountant and the proposed Seller(s) shall pay equally one-half of the fees and costs of the accountant. If the proposed Buyer(s) decline to exercise the option to purchase the Shares after the determination of Fixed Value, the proposed Buyer(s) shall reimburse the proposed Seller(s) for the fees and costs incurred by the Seller(s); however, if any of the Shares are subsequently purchased for the same Fixed Value under this Agreement, the ultimate purchaser shall reimburse the amounts such proposed Buyer(s) paid to reimburse the Seller(s).

11.     Terms of Sale. Unless otherwise agreed, a purchaser of Shares under this Agreement may select any terms of payment for the Shares so long as the following minimum payments are made:

11.1     Down Payment. Ten percent of the purchase price payable within sixty days of exercise of the option;

11.2     Installment Payments. The balance of the purchase price payable in equal annual installments of principal over ten years;

11.3     Interest. Interest payable annually with a minimum interest rate equal to the minimum interest rate permitted under the Internal Revenue Service imputed interest regulations; and

ACC2243E

11.4     Prepayment.  No prepayment penalty for early payments of principal or interest.

12.     Transfer and Cancellation of Shares.  If Shares are transferred or cancelled under this Agreement, the Shareholder shall surrender the share certificate representing the transferred or cancelled Shares to Corporation. Corporation shall then cancel the Shareholder's Shares in proportion to the interest purchased by Corporation, issue Shares to the purchasers in proportion to the interest purchased by the purchasers, and issue a new certificate to the Shareholder for any Shares not transferred or cancelled.

13.     Miscellaneous.

13.1     Specific Performance.  In the event of a sale in violation of this Agreement and in addition to any other remedies available in law or equity, the nonoffending Shareholders or Corporation shall be entitled to enforce specifically the terms of this Agreement.

13.2     Governing Law.  Arizona law shall govern this Agreement.

13.3     Attorneys' Fees.  In any action relating to this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, costs and other expenses incurred in connection with such action.

13.4     Notices.  Notices, or any other communication under this Agreement, shall be in writing and shall be delivered or sent by first class mail postage prepaid, return receipt requested, to the address listed on the signature page of this Agreement or on Exhibit A to this Agreement (which may be changed by notice).  Any new party who becomes subject to this Agreement shall notify the other parties of an address for notices.

13.5     Assignment.  It is the intention of this Agreement to provide for the continuation of the ownership of Corporation by the parties to this Agreement.  Accordingly, this Agreement is binding on, and shall inure to the benefit of, Shareholders, Corporation, and their respective executors, administrators, successors and assigns, including any person or entity to whom any Shares owned by a Shareholder are transferred and the legal representative of any such person or persons, entity or entities.  Any person who acquires an interest in Shares by sale, transfer, assignment or in any other manner from a Shareholder, including any person who acquires an interest in Shares as a result of a marital relationship with a Shareholder, shall be subject to the terms and conditions of this Agreement.

13.6     Entire Agreement.  This Agreement is the entire agreement between the parties and may be amended only by a written document

ACC2243E

signed by all parties. All prior agreements restricting transfer or disposition of Shares are hereby rescinded and superseded.

        13.7    <u>Termination</u>. This Agreement shall terminate upon (1) the written agreement of all parties or (2) the effective date of a registration statement for a public offering of Corporation's Shares.

        13.8    <u>Severability</u>. If any term of this Agreement is declared unenforceable by a court or arbitrator having jurisdiction, that term shall be deleted from this Agreement and the enforceability of this Agreement shall be otherwise unaffected.

        14.    <u>Execution and Effective Date</u>. This Agreement is effective on Feb. 9 , 1995. Signatures of the Shareholders shall be attached to this Agreement in counterpart.

SEMICO RESEARCH CORP.

Address:    1741 East Griswold Road
               Phoenix, Arizona

By _____

        Jim Feldhan, President

6

ACC2243E

## SHAREHOLDERS AGREEMENT

## SHAREHOLDER'S SIGNATURE PAGE

Shareholder has read the Shareholders Agreement and hereby executes the Shareholders Agreement and agrees to all of its terms including the method of determining Fixed Value. Shareholder agrees to sell the Shares as required by the Shareholders Agreement. Shareholder authorizes attachment of this Signature Page to the Shareholders Agreement.

Date: _Feb. 9_, 1995.

_Jim Feldhan_

Jim Feldhan

Address:        1741 East Griswold Road
                Phoenix, Arizona 85020


Number of Shares: 200,000


## CONSENT OF SPOUSE

As spouse of the Shareholder named above I have reviewed and consent to the Shareholders Agreement. I agree to be bound by, and to sell the Shares as required by, the Shareholders Agreement.

_None_

Address:        1741 East Griswold Road
                Phoenix, Arizona 85020

7

ACC2243E

## SHAREHOLDERS AGREEMENT

## SHAREHOLDER'S SIGNATURE PAGE

Shareholder has read the Shareholders Agreement and hereby executes the Shareholders Agreement and agrees to all of its terms including the method of determining Fixed Value.  Shareholder agrees to sell the Shares as required by the Shareholders Agreement.  Shareholder authorizes attachment of this Signature Page to the Shareholders Agreement.

Date: _Feb 1_, 1995.

Jan-Charles Fine

Address:        106 Benvenue Street
                Wellesley, MA 02181


Number of Shares:  100,000


## CONSENT OF SPOUSE

As spouse of the Shareholder named above I have reviewed and consent to the Shareholders Agreement.  I agree to be bound by, and to sell the Shares as required by, the Shareholders Agreement.

Address:        106 Benvenue Street
                Wellesley, MA 02181

8

ACC2243E

<u>EXHIBIT A</u>

| <u>Name of Shareholder</u> | <u>Address</u> | <u>Number of Shares</u> |
| --- | --- | --- |
| Jim Feldhan | 1741 E. Griswold Rd.<br>Phoenix, AZ 85020 | 200,000 |
| Jan-Charles Fine | 106 Benvenue St.<br>Wellesley, MA 02181 | 100,000 |

ACC2243E

# Exhibit  3A

## SALES REPRESENTATIVE AGREEMENT

Between

Semico Research Corporation and Pro Tem Partners, Inc.

Agreement made as of October 2, 2000 between Semico Research Corporation (hereinafter Semico), having its principal office at 7319 N. 16th Street #202 Phoenix, AZ 85020 and Pro Tem Partners, Inc. (hereinafter Representative) having its principal office at 18 Page Road, Weston, MA 02193-003 and are jointly referred to as Parties.

**Whereas,** Semico is a corporation duly organized, validly existing and in good standing under the laws of the State of Arizona, with corporate power to own property and carry on its business as contemplated by this agreement;

**Whereas,** Semico is engaged in the business of marketing analytical and consulting services to the Semiconductor industry and affiliated industries;

**Whereas,** the Representative is a Massachusetts Corporation that represents it possesses the ability to promote the sale and use of services supplied by Semico and is desirous of developing demand for and selling such services on a basis in the territory and for the companies hereinafter described; and

**Whereas,** Semico is desirous of having Representative develop demand for and sell its services in such territory on the terms and conditions set forth herein;

Now Therefore, in consideration of the promises made herein and intending to be legally bound, the Parties agree as follows:

## ARTICLE I.  EXCLUSIVE APPOINTMENT

**Section 1.01.**    Semico appoints The Representative as the exclusive sales representative for the sale of its services to the companies, including all their divisions and subsidiary companies described as follows no matter where their location:

o  I2 Corporation

o  Thomson Financial/First Call

**Section 1.02.**    Semico appoints The Representative as the exclusive sales representative for the sale of its services for all company sites within the regions described as follows and which may be added to from time to time by written agreement:

o all customer sites within the New England, Middle Atlantic and Southeastern   regions of the United States as shown in the following map-Figure 1:



## Figure 1: U.S. Protected Sales Region

**Section 1.03.** Semico appoints The Representative as the non-exclusive sales representative, for the sale of its services for all company sites within the regions described as follows and which may be added to from time to time by written agreement:

o  all customer sites within Europe

Notwithstanding the foregoing, Representative will have exclusive sales rights into all customer sites within Europe that are Pre-Existing Accounts of The Representative as listed in Attachment A to this Agreement and as updated by The Representative at least annually on the anniversary date of This Agreement or, at the most frequent, quarterly. For the purposes of this Section only, a Pre-Existing Account is a site that is purchasing any services or products as listed on Attachment A for the relevant trailing period.

**Section 1.04.** During the continuance of this Agreement, Semico shall not appoint any other or different person, firm or corporation to sell the same services in above described territory or to same companies except as noted in Article 6 below.

**Section 1.05.** Representative accepts the appointment to develop demand for and sell Semico services within the territory and will make all sales here under in accordance with this Agreement.

## ARTICLE II.  TERM OF AGREEMENT

**Section 2.01.**  This Agreement shall continue in full force for twelve (12) years from the date of this Agreement unless terminated pursuant to Section 7.01 of the Agreement.

## ARTICLE III.  RELATIONSHIP BETWEEN REPRESENTATIVE AND SEMICO

**Section 3.01.** Semico shall exercise no control over the manner and method by which The Representative's business is conducted.  Representative shall act in the best interests of Semico.

**Section 3.02.** The Representative is an independent contractor and shall not at any time, make any representation whether in advertising material, promotional material or otherwise, either orally or in writing, that it is an employee of Semico. Representative agrees that in no event shall Semico be responsible for any obligations incurred by The Representative, whether or not occurred in connection with the sale of Semico services with the exception of those permitted under Section 3.04 herein, without the prior written consent of Semico or as delineated in specific contract documents.

**Section 3.03.** Outside of the obligations outlined in this Agreement, Semico is fully independent from the Representative and shall not at any time, make any representation whether in advertising material, promotional material or otherwise, either orally or in writing, that it is an agent of the Representative, although it may mention the existence of a non-binding affiliation. Semico agrees that in no event shall Representative be responsible for any obligations incurred by Semico, whether or not occurred in connection with the sale of Semico services, without the prior written consent of the Representative or as delineated in specific contract documents.

**Section 3.04.**  The Representative shall maintain a sales office for the duration of this Agreement.  The Representative shall pay all general expenses of its office and activities, including rent, utilities, supplies and other expenses not directly attributable to Semico sales efforts. Semico will reimburse The Representative for any expenses directly related to the Semico sales efforts and accompanied by proper dcumentation. This section may be superseded by separate contract.

**Section 3.05.** The Representative shall offer Semico services only at prices and on terms and conditions of sale established by Semico and shall abide by the Company's policies in all matters relating to Semico and its products.

**Section 3.06.** Failure of The Representative to comply with Sections 3.01 through 3.05 shall constitute a breach of This Agreement and as such, shall cause the immediate termination of This Agreement with the written notice required in Article VIII of this Agreement.

## ARTICLE IV.  ACCEPTANCE OF ORDERS AND TERMS OF SALE

**Section 4.01.** Semico shall have the right, in its sole discretion, to accept or reject any and all orders from customers.

**Section 4.02.** The credit risk on sales shall be borne by Semico, but nothing contained in this section shall require Semico to pay commissions on uncollectable accounts as described herein. Further, The Representative understands that it shall not receive payment until Semico has received such payment. Semico agrees, on its part, not to reimburse Representative later than 15 days after its own receipt.

## ARTICLE V. DATA TO BE FURNISHED TO AND BY REPRESENTATIVE

**Section 5.01.** Semico shall furnish the following data pertaining to the Representative's accounts within the exclusive Territory and companies, as well as any other sales closed by Representative:

a. A copy of Semico Sales orders for all customer orders received;

b. A copy of all Semico invoices issued to customers for the sales of services described herein.

c. A copy of all quotations and related specifications made to prospects and/or customers.

d. A copy of all correspondence sent to the Representative's accounts.

e. Sufficient copies of advertising material, newsletters, catalogs, etc. required for the sale and promotion of Semico's services.

## ARTICLE VI.  COMMISSIONS

**Section 6.01** Semico shall pay a commission of 15% to The Representative for all revenue realized from Companies as included in Section 1.01. Semico shall pay a commission of 15% to The Representative for all revenue realized from Companies as included in Section 1.02, except where each and all of the following conditions are met:

a) A single report sale is closed by Craig Steadman, an inside sales person for Semico, within The Representative's protected territory;

b) The sale is not to A Pre-Existing Account of The Representative as listed in Attachment A to this Agreement, further defined in Sections 6.01 (c) and (d)

below and as updated by The Representative at least annually on the anniversary date of This Agreement or, at the most frequent, quarterly;

c) In addition to the list of Pre-Existing accounts as The Parties so recognize on Attachment A, if any of The Representative's accounts within the protected region is sold a portfolio, custom consulting, model or other type of sale that results in annual sales greater than a single report sale and is otherwise not presently a Pre-Existing account of The Representative, it then becomes a new Pre-Existing Representative account, whether or not an initial single report sale was closed by Craig Steadman. Conversely, if an existing Representative account completely cancels all sales with Semico for a minimum of a one year period from an anniversary update to Attachment A and as long as The Representative is unable to re-establish sales volume greater than a single report per annum, it will no longer be categorized as a Pre-Existing Representative account, unless and until that volume is re-established;

d) An Account for The Representative is defined as the group customer site planning to use the Semico product or service as represented by the staff individual with purchasing authority. Purchasing agents are not intended to be the site-dependent individual; and

e) Semico will send by either express mail or e-mail to Representative at Jfsemico@aol.com no less frequently than every October 1 and April 1, a complete listing of all accounts within the Representative's Protected regions for the trailing twelve (12) months, along with revenue received for each account. The Representative will than compare this list to its own account listing and confirm receipt of the listing with any possible discrepancies. Any discrepancies must be resolved.

**Section 6.02** Where all conditions listed in Sections 6.01 (a) through (e) are met and only when they are met, Craig Steadman will be entitled to receive a 9% commission payable directly from Semico and The Representative will receive a 6% commission payable directly from Semico. If all the conditions are not met, Semico will continue to directly pay The Representative a 15% commission on sales received.

**Section 6.03** Semico shall pay a commission of 15% to The Representative for all revenue realized from Companies as included in Section 1.02, except where each and all of the following conditions are met:

a) Qualified leads are forwarded from Craig Steadman directly to The Representative that consummate in a portfolio, custom consulting or other type of non single report sale . Consummation of a sale must be affirmatively made by The Representative through notification to Semico's senior sales executive and to Craig Steadman;

b)   The sale is not to A Pre-Existing Account of The Representative as listed in Attachment A to this Agreement, further defined in Sections 6.03 (c) and (d) below and as updated by The Representative at least annually on the anniversary date of This Agreement or, at the most frequent, quarterly;

c)   In addition to the list of Pre-Existing accounts as The Parties so recognize on Attachment A, if any of The Representative's accounts within the protected region is sold a portfolio, custom consulting, model or other type of sale that results in annual sales greater than a single report sale and is otherwise not presently an existing account of The Representative, it then becomes a new Pre-Existing Representative account, whether or not an initial single report sale was closed by Craig Steadman. Conversely, if an existing Representative account completely cancels all sales with Semico for a minimum of a one year period from an anniversary update to attachment A and The Representative is unable to re-establish sales volume greater than a single report per annum, it will no longer be categorized as a Pre-Existing Representative account, unless and until that volume is re-established;

d)   An Account for The Representative is defined as the group customer site planning to use the Semico product or service as represented by the staff individual with purchasing authority. Purchasing agents are not intended to be the site-dependent individual;  and

e)   Semico will send by either express mail or e-mail  to Representative at Jfsemico@aol.com no less frequent than every October 1 and April 1, a complete listing of all accounts within the Representative's Protected regions for the trailing twelve (12) months, along with revenue received for each account. The Representative will than compare this list to its own account listing and confirm receipt of the listing with any possible discrepancies. Any discrepancies must be resolved.

**Section 6.04.** Where all conditions listed in Sections 6.03 (a) through (e) are met and only when they are met, Craig Steadman will be entitled to receive a 5% commission based on the amount received by Semico over the term of the relevant contract. Craig Steadman will be paid directly from Semico and The Representative will receive a 10% commission payable directly from Semico. If all the conditions are not met, Semico will continue to directly pay The Representative a 15% commission on sales received.

**Section 6.05.** All commissions identified as going to Craig Steadman can only be received by Craig Steadman or his replacement. Semico agrees that no other individuals are to receive portions of that commission remuneration. This commission schedule can be amended by written contract only.

**Section 6.06.** In the event of termination of this Agreement, the Representative shall be entitled to residual commissions on all outstanding bookings.

**Section 6.07.** In the event that Semico or Semico assets relating to the services described herein are acquired, this contract will survive until the culmination of its stated term.

## ARTICLE VII.   TERMINATION

**Section 7.01.** In the case of a key officer of the Representative dying or being permanently disabled from actively pursuing the intent of this Agreement, Semico reserves the right to terminate this Agreement after having paid any outstanding bookings.

**Section 7.02.** This Agreement shall terminate on breach of any material terms.

## ARTICLE VIII. NOTICE

**Section 8.01.** Any notice, request, demand or other communication required or permitted here under shall be deemed to be properly given when deposited in the mail in the city of the principal place of business of the sender, addressed:

    a. In the Case of Semico, to:

        James Feldhan
        President
        Semico Research Corporation
        7319 N. 16th Street #202
        Phoenix, AZ 85020

    b. In the Case of the Representative, to:

        Jan-Charles Fine
        Pro Tem Partners
        P.O. Box 402
        Weston, MA 02193-0003

unless and until a new office is established, at such time that new address will become the address of notification.

## ARTICLE IX. COMPLETENESS OF INSTRUMENT

**Section 9.01.** This instrument contains all of the agreements, understandings, representations, conditions, warranties and covenants made between the parties hereto. Unless set forth herein, neither Party shall be liable for any representations made, and all modifications and amendments hereto must be in writing, signed by the party to be

charged. This Agreement replaces any and all others made prior to the date of this Agreement.

## ARTICLE  X. WAIVERS

**Section 10.01.** If any of the parties shall waive any breach of any provision of this Contract, he or it shall not thereby be deemed to have waived any preceding or succeeding breach of the same or any other provision of this Contract.

## ARTICLE XI. CONTROLLING LAW

**Section 11.01.** The validity, interpretation and performance of this Agreement shall be controlled by and construed under the laws of the Commonwealth of Massachusetts.

## ARTICLE XII. SEVERABILITY

Each of the provisions of This Amendment is a separate and distinct Agreement and independent of the others. If any term of this Amendment is declared unenforceable by a court having jurisdiction, that term shall be deleted from This Amendment and the Enforceability of This Amendment and The Original Agreement it Amends shall be otherwise unaffected.

**In Witness Thereof,** The Parties have caused this Agreement to be executed by their duly authorized representatives. So Agreed.

By Semico Research Corporation, Inc.

_____          _____
James Feldhan, President                                Date



By Pro Tem Partners, Inc.

_____          _____
Jan-Charles Fine, Principal                              Date

**As of Date:**  October 2, 2000

## Attachment A: Pre-Existing Representative Accounts

**U.S.**

1.  Lucent Technologies- Allentown PA
2.  Lucent Technologies, Berkley Heights, NJ
3.  Intel, MA
4.  IBM-Vermont
5.  Compaq, MA
6.  IBM- RTP, NC
7.  IBM- Somers/East Fishkill, NY
8.  Centennial Technologies, Wilmington, MA
9.  National Semi-Portland, ME
10. Gruntal and Company, New York, NY
11. Putnam Investments, Boston, MA
12. Price waterhouse Coopers , MA
13. Corning,-Corning, NY
14. I2 (formerly Aspect)
15. Thomson Financial


**Europe**

1.  HP (Agilent) -UK


Representative's Signature_____

Attachment A--1 of 1

Exhibit   3B

# SALES REPRESENTATIVE AGREEMENT

Between

Semico Research Corporation and Pro Tem Partners, Inc.

Agreement made as of March 31, 2004 between Semico Research Corporation (hereinafter Semico), having its principal office at 1600 East Northern Ave #255 Phoenix, AZ 85020 and Pro Tem Partners, Inc. (hereinafter Representative) having its principal office at 18 Page Road, Weston, MA 02193-003 and are jointly referred to as Parties.

**Whereas,** Semico is a corporation duly organized, validly existing and in good standing under the laws of the State of Arizona, with corporate power to own property and carry on its business as contemplated by this agreement;

**Whereas,** Semico is engaged in the business of marketing analytical and consulting services to the Semiconductor industry and affiliated industries;

**Whereas,** the Representative is a Massachusetts Corporation that represents it possesses the ability to promote the sale and use of services supplied by Semico and is desirous of developing demand for and selling such services on a basis in the territory and for the companies hereinafter described; and

**Whereas,** Semico is desirous of having Representative develop demand for and sell its services in such territory on the terms and conditions set forth herein;

Now Therefore, in consideration of the promises made herein and intending to be legally bound, the Parties agree as follows:

## ARTICLE I.  EXCLUSIVE APPOINTMENT

**Section 1.01.**    Semico appoints The Representative as the exclusive sales representative for the sale of its services to the companies, including all their divisions and subsidiary companies described as follows no matter where their location:

> o  PartMiner, Inc
>
> o  Thomson Financial/First Call
>
> o  Semiconductor Investment Partners LLC

**Section 1.02.**    Semico appoints The Representative as the exclusive sales representative for the sale of its services for all company sites within the regions described as follows and which may be added to from time to time by written agreement:

o all customer sites within the Canadian Provinces of Ontario, Quebec and N.B. , and the New England, Middle Atlantic and Southeastern regions extending until South Carolina, of the United States as shown in the following map-Figure 1:



**Figure 1: U.S. Protected Sales Region**

**Section 1.03.** Semico appoints The Representative as the non-exclusive sales representative, for the sale of its services for all company sites within the regions described as follows and which may be added to from time to time by written agreement:

o  all customer sites within Europe

**Section 1.04.** During the continuance of this Agreement, Semico shall not appoint any other or different person, firm or corporation to sell the same services in above described territory or to same companies except as noted in Article 6 below.

**Section 1.05.** Representative accepts the appointment to develop demand for and sell Semico services within the territory and will make all sales here under in accordance with this Agreement.

## ARTICLE II.  TERM OF AGREEMENT

**Section 2.01.**  This Agreement shall continue in full force for ten (10) years from the date of this Agreement unless terminated pursuant to Section 7.01 of the Agreement.

## ARTICLE III.  RELATIONSHIP BETWEEN REPRESENTATIVE AND SEMICO

**Section 3.01.** Semico shall exercise no control over the manner and method by which The Representative's business is conducted.  Representative shall act in the best interests of Semico.

**Section 3.02.** The Representative is an independent contractor and shall not at any time, make any representation whether in advertising material, promotional material or otherwise, either orally or in writing, that it is an employee of Semico. Representative agrees that in no event shall Semico be responsible for any obligations incurred by The Representative, whether or not occurred in connection with the sale of Semico services with the exception of those permitted under Section 3.04 herein, without the prior written consent of Semico or as delineated in specific contract documents.

**Section 3.03.** Outside of the obligations outlined in this, Agreement, Semico is fully independent from the Representative and shall not at any time, make any representation whether in advertising material, promotional material or otherwise, either orally or in writing, that it is an agent of the Representative, although it may mention the existence of a non-binding affiliation. Semico agrees that in no event shall Representative be responsible for any obligations incurred by Semico, whether or not occurred in connection with the sale of Semico services, without the prior written consent of the Representative or as delineated in specific contract documents.

**Section 3.04.**  The Representative shall maintain a sales office for the duration of this Agreement.  The Representative shall pay all general expenses of its office and activities, including rent, utilities, supplies and other expenses not directly attributable to Semico sales efforts. Semico will reimburse The Representative for any expenses directly related to the Semico sales efforts and accompanied by proper dcumentation. This section may be superseded by separate contract.

**Section 3.05.** The Representative shall offer Semico services only at prices and on terms and conditions of sale established by Semico and shall abide by the Company's policies in all matters relating to Semico and its products.

**Section 3.06.** Failure of The Representative to comply with Sections 3.01 through 3.05 shall constitute a breach of This Agreement and as such, shall cause the immediate termination of This Agreement with the written notice required in Article VIII of this Agreement.

## ARTICLE IV.  ACCEPTANCE OF ORDERS AND TERMS OF SALE

**Section 4.01.** Semico shall have the right, in its sole discretion, to accept or reject any and all orders from customers.

**Section 4.02.**  The credit risk on sales shall be borne by Semico, but nothing contained in this section shall require Semico to pay commissions on uncollectable accounts as described herein. Further, The Representative understands that it shall not receive payment until Semico has received such payment. Semico agrees, on its part, not to reimburse Representative later than 15 days after its own receipt.

## ARTICLE V. DATA TO BE FURNISHED TO AND BY REPRESENTATIVE

**Section 5.01.** Semico shall furnish the following data pertaining to the Representative's accounts within the exclusive Territory and companies, as well as any other sales closed by Representative:

a. A copy of Semico Sales orders for all customer orders received;

b. A copy of all Semico invoices issued to customers for the sales of services described herein.

c. A copy of all quotations and related specifications made to prospects and/or customers.

d. A copy of all correspondence sent to the Representative's accounts.

e. Sufficient copies of advertising material, newsletters, catalogs, etc. required for the sale and promotion of Semico's services.

## ARTICLE VI.  COMMISSIONS

a) **Section 6.01** Semico shall pay a commission of 15% to The Representative for all revenue realized from Companies as included in Sections 1.01, 1.02 and 1.03.

a)Semico will send by either express mail or e-mail to Representative at Jfsemico@aol.com no less frequently than every October 1 and April 1, a complete listing of all accounts within the Representative's Protected regions for the trailing twelve (12) months, along with revenue received for each account. The Representative will than compare this list to its own account listing and

confirm receipt of the listing with any possible discrepancies. Any discrepancies must be resolved.

**Section 6.02.** In the event of termination of this Agreement, the Representative shall be entitled to residual commissions on all outstanding bookings.

**Section 6.03.** In the event that Semico or Semico assets relating to the services described herein are acquired, this contract will survive until the culmination of its stated term.

## ARTICLE VII.  TERMINATION

**Section 7.01.** In the case of a key officer of the Representative dying or being permanently disabled from actively pursuing the intent of this Agreement, Semico reserves the right to terminate this Agreement after having paid any outstanding bookings.

**Section 7.02.**  This Agreement shall terminate on breach of any material terms.

## ARTICLE VIII. NOTICE

**Section 8.01.** Any notice, request, demand or other communication required or permitted here under shall be deemed to be properly given when deposited in the mail in the city of the principal place of business of the sender, addressed:

a. In the Case of Semico, to:

James Feldhan
President
Semico Research Corporation
1600 East Northern Ave #255
Phoenix, AZ 85020

b. In the Case of the Representative, to:

Jan-Charles Fine
Pro Tem Partners
P.O. Box 402
Weston, MA 02493-0003

unless and until a new office is established, at such time that new address will become the address of notification.

## ARTICLE IX. COMPLETENESS OF INSTRUMENT

**Section 9.01.** This instrument contains all of the agreements, understandings, representations, conditions, warranties and covenants made between the parties hereto. Unless set forth herein, neither Party shall be liable for any representations made, and all modifications and amendments hereto must be in writing, signed by the party to be charged. This Agreement replaces any and all others made prior to the date of this Agreement.

## ARTICLE X. WAIVERS

**Section 10.01.** If any of the parties shall waive any breach of any provision of this Contract, he or it shall not thereby be deemed to have waived any preceding or succeeding breach of the same or any other provision of this Contract.

## ARTICLE XI. CONTROLLING LAW

**Section 11.01.** The validity, interpretation and performance of this Agreement shall be controlled by and construed under the laws of the Commonwealth of Massachusetts.

## ARTICLE XII. SEVERABILITY

Each of the provisions of This Amendment is a separate and distinct Agreement and independent of the others. If any term of this Amendment is declared unenforceable by a court having jurisdiction, that term shall be deleted from This Amendment and the Enforceability of This Amendment and The Original Agreement it Amends shall be otherwise unaffected.

**In Witness Thereof,** The Parties have caused this Agreement to be executed by their duly authorized representatives. So Agreed.

By Semico Research Corporation, Inc.

James Feldhan, President                                    04/07/04
                                                            Date

By Pro Tem Partners, Inc.

Jan-Charles Fine, Principal                                4/2/07
                                                           Date

November 9, 2004

James Feldhan
Director/President
Semico Research Corporation
1600 E. Northern Ave. Suite 255
Phoenix, AZ 85068-9850

Dear Jim:

As a result of our BOD meeting and the subsequent management meeting, it appears that the directors are approaching a deadlock on the running of our corporation. In part, this deadlock extends from the misbehavior of the President as we discussed and as reported in the previously delivered letter to yourself as President, and in part from the Directors' disagreement on how to deal with that situation.

Director Fine has made three alternative proposals to avoid deadlock.

**Proposal One: Redefinition of President's Responsibilities and Obligations**

It is first proposed to eliminate the chance of the aforementioned behavior by the President in the future so that:

1.  Feldhan will agree that Semico will hire a new accounting firm to Fine's approval and set up an accounting system that accurately measures each analyst's contribution margin and generates monthly commission statements for all employees paid on that basis. Shirley Shaw or some other individual will become the company's full-time bookkeeper and will work closely and directly with the new accounting firm.  Quarterly financial statements will be generated for the BOD members.

2.  Feldhan will agree to NEVER AGAIN make any decisions outside of his purview. If he isn't sure if a decision needs BOD approval, he will ask the BOD (Fine for guidance). Feldhan agrees that the BOD will pass a resolution and any necessary corporate documents, so that if Feldhan violates any of the restrictions or prohibited behavior in his contract going forward, the CEO alone can terminate his employment prior to the completion of his term.

3.  Feldhan will systematically include Fine in any key corporate decisions including reviews of senior hires, new program development, or any other information that will materially affect Semico Research Corporation.

4.  Given the greater role that Fine will need to engage in, he will receive a prepayment of $18k/quarter for each given year, which will be debited against profit distributions for that given year. If distributed profits to Fine fall short at the end of that year of the $72k, Fine will retain the advances as fees paid for services. If distributed profits are equal to or over $72k for a given year, Fine's basis for distributed profits will be distributed profits minus $72k, with the $72k attributed, in that case, as distributed profits.

Jim, if you choose to follow this course, please respond to this proposal in writing by November 22 so that the appropriate Lewis and Roca lawyers can be called into our meeting (tentatively on December 14, @ 10:30 AM) and prepare the appropriate documents.

**Proposal Two: Office of the President**
It is secondly proposed that a new Office Of The President be created with Mr. Feldhan assuming the role of research president with the title of "Office of the President" and that a new senior individual be hired from outside the company that would assume the administrative roles of the President. To effect this proposal, both Directors and Mr. Feldhan as President would need to agree to this, since Mr. Feldhan's contract would need to be rewritten and the BOD would need to pass a resolution to this effect, and possibly amend the by-laws.

Jim, if you choose to follow this course, please respond to this proposal in writing by November 22 so that the appropriate Lewis and Roca lawyers can be called into our meeting (tentatively on December 14, 10:30 AM) and prepare the appropriate documents. Failing agreement on the first two proposals, the third proposal removes all likelihood of deadlock by eliminating the conflict on the Board of Directors.

**Proposal Three: Buy-out**
Director Fine has agreed, at the price that we discussed, to sell his shares back to the company.

Jim, if you choose to follow this course, please respond to this proposal in writing by November 22 so that the appropriate Lewis and Roca lawyers can be called into our meeting (tentatively on December 14, 10:30 AM) and prepare the appropriate documents.

---

If none of these proposals are acceptable to you, we must confront the path of dissolution. (Please see the accompanying document for a summary of the process of dissolution in the State of Arizona) Unfortunately, until we proceed and complete through the vagaries of the American corporate judicial system, the outcome of this effort is unknown. However, what is known is that the effort will probably cost the company, and each of us personally, significant time and legal fees. Also, what is known is that even if the courts do not order dissolution in this first effort, President Feldhan's contract will expire in approximately 25 months, and without substantial changes to his contract and behavior, this Director will not rehire him, which means the Board will not rehire him. The subsequent implication of this event is that without the Board agreeing on a new President for the Company, the company will again enter an impasse, in that instance highly likely to result in dissolution.

Jim, If I do not receive a written response by November 22 on which of the first three alternatives you would like to proceed with, I will understand that, unfortunately, it is the final path you have chosen to follow.

SINCERELY,

Jan-Charles Fine
Director/CEO/Stockholder/Secretary
P.O. Box 402
Weston, MA 02493-0003

| Jan Fine | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2005 Weekly Sales Activity Plan | | | | | | | | | |
| Goals: | Actuals: | | | | | | | | |
| | | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 |
| Outbound Phone Calls: Min 50 | | | | | | | | | |
| Face to Face Sales Mtgs: 10-15 | | | | | | | | | |
| Proposals: 5 | | | | | | | | | |
| Report Due on Fridays | | | | | | | | | |
| Review on Mondays | | | | | | | | | |
| Please forward proposals and reports to Jim Feldhan | | | | | | | | | |

| Outbound Phone Call Log Week 1: | | | |
|---|---|---|---|
| Customer/Prospect | Name/Title | Contact Info | Follow-Up |

| Face to Face Meeting Log Week 1: | | | |
|---|---|---|---|
| Customer/Prospect | Name/Title | Contact Info | Follow-Up |

| Proposal Log Week 1: | | | |
|---|---|---|---|
| Customer/Prospect | Name/Title | Contact Info | Follow-Up |

| Business To Be Closed in Next 4 Weeks | | | |
|---|---|---|---|
| Customer/Prospect | Project | Revenue | Close Date |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| Critical Projects To Be Closed | | | |
| Customer/Prospect | Project | Revenue | Close Date |

**SEMICO**
Research Corporation

◆ Data
◆ Analysis
◆ Knowledge

## PERFORMANCE IMPROVEMENT PLAN
## CONFIDENTIAL

To:       Pro Tem Partners, Inc., Attn:  Jan Fine
From:    Jim Feldhan
Date:     May 9, 2005
Re:       Performance Improvement Plan (PIP)

Gentlemen:

The purpose of this Performance Improvement Plan (PIP) is to define areas of concern that relate to developing new business and maintaining current clients, and to establish Pro Tem's sales target for 2005.  To that end, I am taking up the following:

## AREAS OF CONCERN

- Getting timely feedback to Semico, on an ongoing basis, regarding current and potential customers.
- Renewals need to be actively worked well in advance of the scheduled expiration date of the order.  In other words, renewals need to be timely processed.
- Increasing revenue from renewal customers is also a focus.
- Developing new contacts and accounts in the semiconductor industry.
- Expanding contacts within current customer organizations.
- Identifying needs and opportunities within customer organizations that Semico services might fill.

## OBSERVATIONS, CONVERSATIONS

As you know, trip and customer call reports are extremely important to the success of Semico.  Those reports, addressed further below as a part of Activity Reports, would include customer profiles to better enable Semico to understand its customer base, the competition and customer requirements.  Your role is to present Semico in the best possible light, with a sharp focus on selling our current services and emphasizing our core competence.

## SEMICO'S EXPECTATIONS

Our goal is to grow sales substantially in 2005 and subsequent years.  This is the essence of the Sales Representative Agreement between Pro Tem and Semico – which calls for your developing demand for, and sales of, Semico services in your territory.  Your performance over the last several years has reflected a disturbing trend of declining sales, and that simply can't continue.  Pro Tem sales in 2003, which in turn represented declines when compared with 2001 and 2002, totaled $302,000.  The subsequent year, 2004, marked yet another decline, to

1

$260,000.  This represented a decrease of 13.9%.

In short, Semico is expecting an increase of 25% in 2005 over Pro Tem's sales during 2004.  That targeted increase, originally contemplated at 40%, has been reduced in view of our already finding ourselves at May 9, 2005.  Nonetheless, I am confident that this target, at $325,000 in total 2005 sales, can be exceeded if Pro Tem were to exert even less than extraordinary efforts.  I would here add that the 25% target for Pro Tem represents the lowest target assigned by Semico to any sales representative for 2005.

As you know, there is typically a strong correlation between targeted sales increases and the activity/efforts of the particular sales representative that are designed to bring about those increases.  To that end, and to facilitate growth and our collective success, I am enclosing a "2005 Weekly Sales Activity Report" that Semico would strongly recommend you follow in terms of the stated goals.

Those Activity Reports also serve a critical function, wholly independent from tracking sales related activity; namely, to generate information needed by Semico that will affect staffing of projects, and aid in determining how projects are to be positioned in the pipeline.  In other words, the Weekly Reports must be submitted whether or not you choose to adopt the recommended goals.

In connection with the above, you will be reporting to Jim Feldhan, who will be your sole point of contact at Semico.

**TIMELINE FOR IMPROVEMENT**

Effective immediately, Semico is placing you on this PIP.  Accordingly, you will be expected to meet or exceed the $325,000 total sales target for 2005 and to timely submit, each week, a completed Activity Report.

The PIP does not alter the Sales Representative Agreement; it goes, rather, to its implementation..  The content of this PIP is to remain confidential among Jan Fine of Pro Tem and Jim Feldhan and Sherry Garber of Semico.  Should you have questions or concerns regarding the content, you should follow up directly with Jim Feldhan.

I am scheduling a telephone conference with Jan Fine for Monday, May 16, 2005 at 8:30 a.m., PDT to review Pro Tem's progress during its first week under the PIP.

A hard copy of this document is being mailed to you, which I would request you promptly sign and return to me.

C:\Documents and Settings\JimF\My Documents\legal\jan pip\Perf.Imp.Pla em.doc

Rep Name:          Pro Tem Partners, Inc.

Rep Signature:

PRO TEM PARTNERS, INC.
By: _____
        Jan-Charles Fine, President

Manager Name:      Jim Feldhan

Manager Signature:

Date:      5/9/2005

Sincerely,

Jim Feldhan

Exhibit   7A

June 29, 2005

Jim Feldhan
Semico Research Corporation
100 East Northern Ave. Suite 255.
Phoenix, AZ 85020

Dear Jim:

This envelope includes both PTP's response to your previous letter and my second mailing of PTP's expense report form for the June 7th sales trip to IBM and Lenovo in Raleigh N.C.

Sincerely,

Jan-Charles Fine
Pro Tem Partners

**VIA FIRST CLASS US MAIL AND E-MAIL**

Att:
Jim Feldhan
Semico Research Corporation
100 East Northern Ave. Suite 255,
Phoenix, AZ 85020

Dear Jim:

I have just read you undated letter titled _Performance Improvement Plan/Sales Representative Agreement,_ which was in response to Pro Tem Partner's (PTP) letter to you of May 20, 2005, which in turn, was a response to your earlier memo. To start, it is obvious from both your words and your behavior that you are intent to undermine the PTP Sales Agreement, and you are attempting to position your actions on false claims. Your repeated letters and frequent communications with this intent are counterproductive to the relationship between our two companies. It is almost as if you think by repeating your false claims and pejorative statements that observers will believe that they are true. In contrast, I think the facts will speak for themselves.

Your letter rambles on and covers a myriad of issues that have already been addressed, refuted or exposed as unsubstantiated. However, to finally put the Sales Agreement matters to rest, I will address them here. My responses below will only address the issue at hand, the existing Sales Agreement between Semico Research and Pro Tem Partners.

To reply and restate the truths inherent in my last letter:

1. My letter did not state that "Semico revenue growth significantly turns on the Company hiring one or more domain experts in allied semiconductor fields". It does state that "Although it is certainly PTP's first responsibility to sell Semico's existing services and products, it has to be noted that _PTP's territory_ for companies that would be interested in semiconductor information is dominated by communication, equipment/equipment supplier related companies and medical device companies, in addition to Wall Street/financial companies. Given the limited sales base in PTP's territory when compared to our present offerings, there are several obvious ways to increase sales. First is to supply potential and existing customers what they want, which are domain experts in allied semiconductor fields which we presently do not offer. As a result of my sales trips, many customers have expressed interest in the communications related domain expertise, with some of them suggesting consultants they would like to work with in that area. PTP has forwarded this information to both Mr. Feldhan and Ms. Garber several times over the years."

The key words in the previous paragraph that you missed are "PTP's territory for companies that would be interested in semiconductor information" not as you state "Semico". Semico, in general, and you in particular, have full access to the lists of appropriate companies located in PTP's territory. If you are aware of significant companies who make their purchases within PTP's territory, that we have not approached together over the years, and that would be candidates for existing Semico domain expertise, please forward those contacts to me. I will then contact any ones I haven't recently contacted. However, I again state that my paragraph above is accurately reflective of the real issue. If you want to be successful in information sales, you must sell customers what they want, not what you happen to have.

1

The real problem with PTP's ability to grow is that you, Jim, don't want it to grow and so avoid investing in your analyst base. May I remind you of your e-mail to me of 8/19/2004 where you stated: " And you know Jan I really have no desire to grow or hire a bunch of people!" This was telling in that you were ignoring your responsibilities to PTP and your other sales agents and staff, as well. Of course you will claim some excuse for that message, but, in fact, it was one of the most honest statements you have ever made.

2.  This paragraph dovetails with the last one. You state "The short answer is that when the Company used search firms recommended by you in the past, those firms performed in a mediocre fashion at best". The truth is that you have **never** hired an executive search firm recommended by me. You made some of the motions to make it look like you were going to use them, but, in fact, you never did. Bill Van Zanten will testify to the truth of this statement. If you weren't happy with Bill, you could have contacted another firm. I sent you a list of 19 semiconductor industry oriented search firms in May of 2001. You never contacted any of them. To offer a specific example of your unfortunate behavior, I even found out that you had once invited (at the candidate's expense) an employee candidate, Matt Doty, from Phoenix to meet Sherry Garber in San Francisco and then didn't have the meeting or even tell Sherry about the meeting in advance.

3.  You, as a company manager are due your views as to the value of hiring known names in the consulting portion of our business, as I am due my opinion that you are incorrect. However, your position is not even consistent. I do remember that name recognition was one of the reasons Semico hired Jim Handy to head up his domain, a known name in the non-volatile memory business. It is a generally accepted principal throughout the consulting and Continuing Information Services (CIS) world that clients often follow practice leaders when they migrate from one consulting firm to another.

4.  You state "PTP has not even once secured a corresponding order – although you did receive commissions on the PAMS and Nanometrics sales solely because of their attribution to your territory." This is not at all true. As an example of how inaccurate these type of statements you make without merit are, consider that I first brought in the PAMS contract through a significant number of calls with a consultant, Cliff Conneighton, who PAM had hired to secure an information supplier for the eventual contract. It is true that the original lead came from Dave Cavanaugh, but I eventually closed this contract with Dave Cavanaugh's presence and assistance. PTP made at least three separate visits to PAMs during this process, two of them without a Semico analyst present. I, personally, also developed a supportive relationship at PAMs, with both the President, Bill Gately and Chris Moore, the Product Manager.

In the case of Nanometrix (notice the spelling, there is another firm with the name Nanometrics), I had several conversations with Patrick O'Connor, who had contacted me through our web site, to kick off and close Phase 1 of the contract. I was then left off out the loop as the contract progressed, and only found out about that fact when I subsequently spoke with Mr. O'Connor to gauge his satisfaction with the first phase. This is a another specific example of a violation of our Sales Agreement. The problem here is not PTP's outreach efforts, but rather Semico's continuing and persistent lack of support for PTP's sales efforts. That was at the point that you had appointed, according to both yourself and Sherry, Dave Cavanaugh as a sales person for the company and he appeared more interested in taking over the account than working with PTP. After the PAM project, I was notified by Sherry that Dave was no longer available for consulting as you had agreed to make him a full-time salesperson.

5. Your comments state as follows:" the sales force needs to first do some serious prospecting (i.e., developing demand, to include confirmation that serious customers are in fact out there and likely to retain Semico for their equipment manufacturing analysis/consulting needs)." This statement demonstrates a considerable naiveté on how consulting practices and sales are developed. I understand that you, Sherry and the others there who once worked under Jack Beetle were, as you all have often related to me, prevented from doing consulting while at In-Stat. So I understand that you don't have that background. All the more reason to take guidance from PTP. I have spent a good deal of my career in consulting sales and have been quite successful at it. Please remember that it was I who introduced or closed substantial consulting contracts to Semico—with a few examples being the founding contract with IDC when I started Semico, as well as ZBI, Corning, IBM, I2, and others. Please understand that consulting sales are very different from report sales, where one has a tangible product to sell. In the case of consulting, it is usually an intangible sale that rests on the reputation and knowledge of the specific consultant—especially when trying to first break into an account.

6. In further response to your comments about qualifying leads, when PTP finds a lead for a portfolio sale or report (e.g., tangible products or services), we always attempt to qualify the source before analysts travel to the site. Exceptions to this are when it is new territory and there are a large number of firms to visit such as was the case in Canada, and is now the case in New England for semi equipment and suppliers. In those cases, we need to introduce Semico to these potential customers, and understand whether their needs are for our CIS or for consulting. For example, in the Canadian sales trip of last summer, we found that iSuppli, and to a lesser degree Gartner (formerly Dataquest) was in most of these accounts. As I'm sure you recall, I had just been granted the Canadian regions by Semico, and found out from the Canadians that no one from Semico had ever visited these accounts before! Although these accounts are almost all communication oriented, they did express interest in a number of our capabilities. As you are aware, following the trip and at their request, PTP sent in proposals to them for IP reports (Elliptical Semiconductor), custom consulting on vendor shares of customer markets (Icefyre), and Embedded memory and SOC reports (MOSAID, Tundra). However, in the end, they didn't purchase anything-in some cases due to limited budgets that were already dedicated to iSuppli, who have multiple consultants in the telecom area  (e.g., Steve Rago, Scott Smyser, Jagdish Rebello and Andrew Rassweiler) and in some cases, (e.g. Icefyre) because the data wasn't in a form they could use. This was all reported back to you.

   In summary, when it comes to qualifying potential consulting sales, there is no way to know in advance whether or not these companies will actually purchase consulting from us, until after the preliminary on-site meetings. Their willingness to see us is the qualifying event. Also, you should be aware that it will probably take several subsequent contacts with these companies before we see any consulting sales. That is because we need to establish our credibility and because consulting sales timing is somewhat serendipitous—consulting assignments happen when internal organizational needs at customers dictate them. They are not usually ongoing. However, be clear that if we don't have analysts visit these sites, as do our competitors, closing significant sales there is highly unlikely. That is the way it works!

7. Contrary to your assertion, PTP has made numerous on-site sales calls without a Semico analyst present, when that was appropriate. Just off the top of my memory, example companies include ADE, Intel, PAMs, HP, IBM, EMC, National Semiconductor, Fairchild and a host of Wall Street companies. These efforts are, of course, in addition to telephone and e-mail outreach that we are more frequently engaged in, given the wide geographic dispersion and low density of our potential customers versus, say, Silicon Valley.

8.  Some of the other specious claims you make are just unbelievable. You claim that "PTP has apparently never sought to develop contacts at IBM's headquarters in New York". Yet, you know that isn't true since you and Sherry have accompanied me on sales visits to White Plains. I also have informed you several times in the past that the corporate staff at headquarters was not interested in working with us as a semiconductor industry information supplier, and that they referred me back to our usual contacts, elsewhere in the company. You also claim "In other words, for PTP to seemingly rely solely on old contacts at IBM's Raleigh offices hints of a serious level of complacency having set in". You also know that this is not true. First of all, we have sales at IBM's Essex Junction, Vermont site through my relationship with John Keenan. In the past, I have also called headquarter staff in NY to try and get assistance in penetrating the sites in Hopewell Junction and East Fishkill, NY, which were, in the past, customers. As you know, since I previously related this to you, they told me that those two sites were not interested in changing from iSuppli, and in any case, their research budget for iSuppli has been shrinking considerably, as well.

9.  In terms of Semico's violations of the present sales Agreement. You state:

> 1. "You are correct that it has been customary, in the past, for PTP to receive commission payments within the first four days of the new month. That practice carried over through April 2005, although you state that payments were not forwarded to PTP in a timely manner for two out of the last three months (i.e., for February through April). As you know, one payment did apparently get lost, and Semico promptly replaced the lost check once it was alerted to the situation. In terms of going forward, I would agree with you that Section 4.02 of the Agreement governs, and that is how we will proceed from this point forward, with the reconciliation called for under Section 6.01 to occur on October 1, 2005. Further, PTP needn't bother anymore with invoices, since they aren't contemplated under Sections 4.02 or 6.01."

Response to 1: Despite your assertion, I do not know that your payment was lost. Given your other harassing behavior towards PTP, it is as fair to assume you never originally sent it and are now trying to cover your path. It is true that the Agreement does not call for receiving a complete listing of all accounts within the Representative's Protected regions for the trailing twelve (12) months, along with revenue received for each account on a more frequent basis than October 1 and April 1. However, it is not in Semico's nor PTP's interest to hold back this information since we often use the final payment information to contact the customer, do "handholding", and set the stage for follow-on sales. Also, by not reporting to us the variable sales from our ongoing Wall Street accounts, we can't possibly forecast future revenue from this source. Although it is not a highly reliable base for future estimates, it is the best we would have, as we use this data as a time series to get an estimate of future sales—something you can easily do yourself without any feedback from PTP. In fact, since you are withholding this data, we do not even know what our present sales are, let alone future sales. This is just another in a long list of support failures or adverse policies Semico now follows in its attempt to undermine and lower the value of the PTP Sales Agreement.

2. You state that "in a number of cases, Semico has failed to send PTP copies of all Semico invoices" issued to PTP-related customers. While I'm not certain what cases you are referring to, it is plain that such occurrences, if any, were immaterial in number or amount and that you in any event received or will receive your corresponding commissions. If, in your complaint, you are referring to IBM, no corresponding invoices are generated. As you know, Semico seeks payment from IBM by logging on to the customer's website, searching for the corresponding purchase order, and then striking the appropriate key as a request for

4

payment. There is no hard or printable version of that request. In conclusion, your assertions on this point are groundless.

Response to 2: Please refer to Exhibit 1: Semico's Sales agreement Violations List below

3. You indicate that "in a number of cases, Semico has failed to send PTP a copy of all quotations and related specifications made to prospects and/or customers." That assertion is also groundless. As you know, the vast majority of quotes to customers and prospects in your territory are prepared for you in Phoenix, after which you're charged with presenting them. Hence you are always necessarily involved, except that, in some instances, a few orders may have been received directly on our website or did not involve quotes. In any event, kindly advise of the very "cases" you are referring to. If there really were any, I'm comfortable they were immaterial in number and significance.

Response to 3: Please refer to Exhibit 1: Semico's Sales agreement Violations List below

4. As for Semico's supposed failure to forward to PTP all correspondence sent to its accounts "in a number of cases", please identify the correspondence you are referring to.

Response to 4: Please refer to Exhibit 1: Semico's Sales agreement Violations List below

Following is a partial list of Semico's existing and probable violations. Please note that since Semico is withholding account payment reports, PTP does not know if some of these accounts are just tardy or truly haven't paid. It is entirely likely that more complete availability of Semico's customer information would lead to a longer list of violations. The sources of this information is either from past discussions with PTP customers or from the lack of supporting documentation associated with commission payments from Semico.

### Exhibit 1: Semico's Sales Agreement Violations List

| Companies | Commissions | Sales orders | Semico invoices | Quotations and related specifications | correspondence |
|---|---|---|---|---|---|
| Cabot | | X | X | X | X |
| Corning | | X | X | X | X |
| EMC | X-Note 1 | X | X | | X |
| Gerson Lehrman | X-Note 2 | | | X | X |
| Silver Lake Partners | | X | X | X | X |
| USB Warburg | | X | X | X | X |
| Wired Island | | X | X | X | X |
| RF Micro Devices | | X | X | X | X |
| Standard & Poors | | X | X | X | X |
| IBM | X-Note 3 | | | | X |
| Northrup Grumman | | X | X | X | X |
| ATMI | | | | X | X |
| TVM | | X | X | X | X |
| SC&A | | X | X | X | X |
| VISTA Research | | | | | X |

Note 1: Customer informed PTP that they were an attendee at Semico Summit
Note 2: PTP has been shortchanged $1,322 in commissions which has never been forwarded.
Note 3: It is possible that PTP was not compensated for sponsorship fees

You state :

5. Regarding Semico's supposed failure "to send PTP any advertising material, newsletters, .

5

. . catalogs required for the sale and promotion of Semico services," PTP is in fact on the distribution list (as are all other sales representatives of Semico) for all new or updated significant materials. If, however, PTP has run out of any such items, it is incumbent upon PTP to promptly advise Semico, at which time the requested items, in reasonable quantities, would be forwarded. You further complain that you were not receiving price lists. There are, generally, no price lists, and in any event, Section 5.05(e) is silent regarding any such lists. You also complain that "only" electronic copies of new reports have been received. This is 2005, and electronic distribution is absolutely common in the world today. Just turn on your printer.

Response: As usual, you are misrepresenting the claim I sent you. I wasn't complaining about the fact that what Semico has sent to PTP was electronic in form. PTP, in fact, prefers that. The point is that we have not regularly been receiving updated marketing collateral in any form, electronic or hard copy, and that we have only been receiving reports and Tables of contents (TOCs). PTP realistically expects that as Semico updates its marketing collateral, that the company will send both electronic copies and hard copies to PTP. Since Semico currently withholds from PTP all information on its new programs. portfolios, etc., we have no way of knowing on a timely basis when to request these sales support documents. From now on, Semico should automatically send those to PTP as developed, if you are truly interested in growing sales in PTP's territory. If PTP is on the distribution list, as you state, then you are in violation of your own intent as we have received no electronic marketing collateral since Mid 2004, until several days ago, in response to my request for support for the Corning account. We also have only received 4 hard copies of the collateral after this complaint was made to you previously in May.

The Agreement may be silent on prices, but I would challenge you to find a sales representative who can sell products or services without being able to communicate the price of that which is to be sold. I understand that Semico would not want to publish price lists for outside consumption, but it is incomprehensible not to arm your sales representatives with this information. It is just another barrier to prevent PTP from achieving sales so that you can claim we are not doing a satisfactory job.

10. In terms of PTP's role in the PIP plan, You state:

"It's plain from your letter that you are actively resisting implementation of the Performance Improvement Plan communicated to PTP on May 9, 2005, including your required submission of Weekly Sales Activity Reports. As was stated in the PIP, those Reports serve legitimate critical functions by enabling Semico to track sales-related activity and identify the customer base and potential customers, as well as allowing for efficient staffing of projects and business forecasting. These Reports are required, by Company policy, of all Semico sales representatives. In that regard, I would remind you that Section 3.01 of the Agreement, partially cited in your letter, also states as follows:

Representative shall act in the best interests of Semico.

Section 3.05 of the Agreement then goes on to state that:

The Representative. . . shall abide by the Company's policies in all matters relating to Semico and its products.

Further, your compensation for performing the above duties, among others, is the fifteen percent

6

commission detailed in Section 6.01. For you to claim an entitlement, over and above commissions, of $600 to $1,500 per week for complying with Company policy at the very least smacks of arrogance, particularly where the activity to be reflected in the Reports is a normal manifestation of what sales people are expected to do. Semico has a legitimate interest in knowing that such activity is regularly occurring in all of its sales territories. Indeed, I find it perplexing that PTP is a proponent of dramatic staff increases while at the same time being unwilling to share with Semico (except for more money) any basis that goes to justifying those increases. Similarly, you take great pains to point out that a substantial part of the PTP portion of Semico's customer base has seemingly evaporated by reason of "a very difficult economic period." One would think that PTP's time would be better concentrated on recapturing customers or finding new ones and communicating to Semico, on a relatively concurrent basis, the very nature of those efforts. In summary, PTP's ongoing failure to abide by Semico's uniformly applied Weekly Activity Report policy constitutes, standing alone, a violation of Section 3.06 of the Agreement. Similarly, that inaction on the part of PTP, being inconsistent with PTP's duty to act in the best interests of Semico, represents a separate violation of Section 3.01 of the Agreement."

Response : First of all, Let me reiterate PTP is fully willing to cooperate with the PIP. However, PTP is not a charity, we are a company just like Semico that is trying to remain profitable. That is not arrogance but, rather, the reality of business. Of course, it is reasonable to expect that PTP will furnish Semico with necessary information so that customer contracts can be pursued and billed accordingly. That information has been and will continue to be provided through the sales order process, which is already in place, as well as other communications that PTP makes periodically to Semico's Management

**PTP Does not withhold any forecasts or forecast information from Semico**. In fact, just the reverse is true. The information that Semico is now withholding from PTP injures our ability to approach our existing and potential customers, and injures the Agreement. Semico is always informed by PTP of customer status, as PTP becomes aware of the information.

As an example, PTP attempted to contact EMC, an existing customer, several times towards the end of last year before their contract expired. PTP has maintained a relationship with senior executives at EMC that pre-dates my, Jan Fine's, founding of Semico.

Although EMC did not respond to those inquiries, PTP just successfully completed some follow-up with them, to find out why they reduced services under contract to Semico this year from last. Although they still currently receive the IPI report and attended the Summit, they no longer are purchasing the manufacturing service. They told me that they currently purchase the DRAM service from Victor DeDios, as they have for 12 years. They also told me that they decided to switch their manufacturing service to iSuppli, and are very satisfied with their offering. They have also decided to purchase from IC Insights, the McClean Report and IC Knowledge. A great deal of the reason they made these decisions, according to them, was that all of these services were offered to them at prices much lower than Semico's, with quality—their opinion--at or higher than Semico's. They are planning to again attend Semico's Summit next year.

PTP already relates all of this type of information back to Semico as it becomes available. The PIP will not add to that information flow. It will only add administrative time and burden.

I reiterate that when the Agreement was signed, the structure was that compensation was based on sales and no formal reporting structure was required. If you would like to institute an elaborate reporting system, PTP needs to be compensated appropriately. All of PTP's remuneration is at

risk in terms of a commission only structure. That was acceptable to PTP as long as the bureaucratic and administrative overhead was kept to a minimum. The new reporting structure was not envisioned when the Agreement was signed off on. This fact is spelled out in the Agreement: "Semico shall exercise no control over the manner and method by which The Representative's business is conducted". If Semico wants PTP to increase its reporting efforts and other administrative overhead, that is also possible, as long as commensurate compensation is included.

Again I reiterate that once an Agreement is reached on a fair compensation structure, and taking into consideration the form you sent, PTP can prepare a weekly document that:

1.    Spells out which customers were contacted, attempted to be contacted, and the results of those efforts. Since many communications are today on the Internet, we could also specify whether the contact was by Internet or Phone.

2. Identifies all new proposals, and

3. Makes suggestions for improving sales completion rates as a result of customer outreach

In addition, PTP would be willing to engage in a weekly review meeting, at times mutually acceptable to both parties, that would review these and other issues.

I must point out again that you currently receive all new requests for proposals, and the names of contacts at that company before the related proposals are sent out, with the only exceptions being standard reports, which PTP responds to just as you would in a web purchase. Even in those cases, you still receive the contacts name and information in the Semico Order Form that PTP submits to Semico. PTP also submits to Semico any suggestions we have for increasing sales penetration. Thus, the only new information you are going to glean from the PIP is the extent of PTP's outreach efforts. Depending on the activity during a given week, PTP estimates that the reporting efforts, not required under our Agreement, and delineated above could take from 2 hour to 5 hours, assuming that the weekly meeting does not last more than an hour. PTP's billing rate for Jan Fine, who would be the individual proposed with this responsibility is $300/hour, identical to Semico's rate. Again, Semico would only be charged for time spent.

11. You state in regards to dropping PTP from Semico's website:

"I also acknowledge receipt of your June 1, 2005 email regarding PTP's having been dropped from Semico's website. This was done in reaction to PTP's ongoing resistance to reasonably providing the home office with information of the type discussed above that is needed for staffing, forecasting and the like. Understand, however, that as Semico receives inquiries on its website from customers or potential customers in your territory, they will be forwarded to you, via email, on a substantially concurrent basis (except to the extent time zone differences or weekend/holiday receipt cause a measure of delay). After PTP receives the forwarded inquiry, you will need to reach the undersigned, as your designated contact at the home office, for purposes of determining the appropriate response and allocating related responsibility. We would then button down, for example, matters pertaining to qualification of the account, identification of customer budgetary issues, presentations to the customer with or without analyst support, and preparation and timing of quotes or proposals."

Response:  This response of yours is most telling. PTP reiterates that you already receive all of the information that PTP has in its possession as to future sales, and we are not resistant to complying

with the PIP as long as we are fairly compensated. That you would both hurt the company and PTP's sales efforts because we will not permit you to unfairly burden the contract is unbelievable. You state–and given your poor history of communication with us and your violation of the contract in these clauses as pointed out above, I remain to be convinced— that you will "e-mail PTP, on a substantially concurrent basis, customer inquiries in our territories". However, just in the last few weeks alone, you have failed that promise, as I have found out that VISTA Research had contacted a number of Semico consultants on June 17th and by June 21st, I still had received no notice! In fact, I didn't receive any notice until I had contacted you about my customer's needs.

In addition, even if Semico could adhere to your proposed schedule, both Semico and PTP will lose sales since many individuals use that information to follow-up with phone calls to PTP. Without having regional representation, it should be expected that, at least, some of them will go instead to our competitors who do present regional representation.

12. As the result of conversations and e-mails we have recently had, you have admitted to me that Semico's own sales, which you perceived (e.g., In February) would be 40% above last years' are now as you stated; "…sales YTD as of May 2005 were 40% lower when compared to 2004 January through May" (e.g. as of May 31). So to complain that PTP sales are declining, when Semico's territories including the booming regions of Asia appear to be declining faster, is hypocritical and just a scapegoating effort.

Jim, I am hoping you will come to your senses and re-establish support for Pro Tem Partners and stop trying, at the same time, to unfairly burden the contract, so that we can continue to robustly represent and execute sales for Semico in our territories. In answer to your question on how to assist PTP in realizing higher sales, better informational support and re-establishing our linkages to customers, as well as offering programs and products that our customer base is interested in, is how to assist PTP in increasing our sales. I notice, as of this letter, you have still not resurrected PTP's contact info on the Semico site. Semico plans on continuing to perform under our existing Agreement, as we have for almost ten years. Any sales targets you randomly ascribe to PTP will neither diminish nor increase our efforts, if it falls outside of our Agreement. Until you turn towards a real growth strategy, PTP sales efforts will remain undiminished, but our knowledge of what the future holds is blinded by your inaction.

Instead of writing unsubstantiated letter after letter, I hope you spend more time trying to rebuild the company's offerings, so that both our companies can prosper.

Sincerely,

Jan-Charles Fine
Pro Tem Partners, Inc.

9

Exhibit   7B

7/6/05

Dear Jan,

I've given considerable thought to our exchanges of emails since June 29, including your nine page letter received Friday. Suffice it to say that taking up each and every point in your letter would be a waste of time and counterproductive. As a general proposition, however, Semico views the positions taken by ProTem in the letter to be baseless and a lame attempt to blame others for your shortcomings. It also demonstrates confusion on your part as to the scope of ProTem's contractually prescribed duties. Semico has consistently supported ProTem, despite your non-cooperative conduct.

As for your stated memory of ProTem's account development actions, it is far from accurate; although no one would dispute your significant role regarding the IDC contract. In any event, that was then, and this is now.

Speaking to the present – I was struck by your recent revelation, after considerable prodding on the part of Semico to get information concerning your activities in the ProTem territory, that ProTem is experiencing major difficulty in lining up appointments with customers and potential customers. I had been asking for several days for a list of the individuals you've called on (i.e., names and phone numbers) and what organizations they represent. Now you claim you don't keep those sorts of records. How would you know, then, whether you called a particular person if you don't maintain records?

ProTem continues to throw roadblocks up by refusing to share, with any reasonable measure of specificity, information about what it's doing, and the identity of the individuals you are calling. As I've told you repeatedly, getting this information to Semico on a timely basis is critical. It also legitimately enables Semico to get a sense of whether progress is being made in terms of ProTem's performance of duties under the Sales Representative Agreement. If this information is not shared with Semico on a timely basis, it is impossible for headquarters to lend ProTem any meaningful assistance. For example, if ProTem would at the outset develop lists of customers or potential customers that you might be able to visit on a planned sales trip, Semico would gladly try to come up with supplemental targets for such a visit.

In the end, I'm getting the distinct impression that ProTem's withholding of information may be largely motivated by an effort to disguise a serious lack of effort and activity as regards its duty to develop the territory and to undermine Semico's revenue growth. Both of actions are not in the best interest of Semico Research Corp. It really goes back to basics: ProTem needs to step up its efforts to secure interviews with candidate customers, and then proceed with qualifying them to see if they represent a real opportunity. ProTem should have been doing this months ago, rather than now complaining that some combination of summer vacations and Semicon West accounts for lack of appointments.

In closing, Semico and ProTem do agree on one issue; namely, that the Sales Representative Agreement is being undermined. It's time for ProTem to perform, so that this unfortunate state of affairs may promptly end.

1

Please provide the requested PIP for ProTem's sales activities since May of 2005 as outlined in you PIP plan.  This PIP report should be delivered to me by end of business July 13, 2005.

Sincerely,


Jim Feldhan
President
Semico research Corp.

Exhibit   7C

# VIA FIRST CLASS US MAIL AND E-MAIL

July 13, 2005

Att:Jim Feldhan
Semico Research Corporation
100 East Northern Ave. Suite 255,
Phoenix, AZ 85020

Dear Jim:

Pro Tem Partners has previously established the facts, in detail, in the past letters we have sent you. There is no need to repeat them again here. Over the last 6-8 months Semico has not only severely restricted support for PTP's sales efforts, it has also engaged in a harassment campaign to unreasonably burden the contract, unreasonably delay payment of travel expenses, place barriers between PTP and Semico's consultants, and has engaged in a range of other pernicious behavior.

Contrary to your claims, PTP has not expressed experiencing major problems in lining up appointments with customers and potential customers. As you know, I had originally wanted to set the sales call for June, but Dave Cavanaugh was taking classes at the university at that time, so we needed to set it for July, which is not as good a time to launch sales efforts, due to vacation plans. You, as represented by your e-mails, resisted supporting PTP and tried to have PTP establish these new accounts without Dave's presence. This was a set-up attempt by you to have PTP fail in its efforts so that you could later claim we did not perform. I correctly resisted this attempt, but by the time you finally agreed to let Dave travel east, there was not enough time left before Semicon. It turned out that the newly scheduled week was too close following Semicon West. Many potential candidates were planning to take their vacations at that time since they were spending the previous period at Semicon. I could have set up 1 or 2 meetings during that week, but it makes much more sense to reschedule the sale trip for the fall when most or all of the potential customers will be available. Nevertheless, taking advantage of the conference, I proceeded to set up a number of interviews for Dave and other Semico consultants at the conference. The record speaks for itself.

The current plan is for Dave to meet them first at Semicon and then we can follow up together in the Fall, with our on-site visits. I will also set up other meetings then for the few companies that did not have suitable representation at Semicon. I am confident that I can arrange those meetings as long as the customers are suitably impressed with Dave, as I am sure they will be.

As I have oft repeated, PTP does not withhold any key information from Semico. As I have repeatedly demonstrated, the reverse is true, that Semico has been withholding information from PTP that would greatly aid in its sales efforts. Your lack of support is unquestionably lowering the amount of sales PTP has been and will be able to close. Specifically, in terms of these contacts, you have had the list of companies all along that I was attempting to contact. PTP, at the outset, developed lists of customers and potential customers that we would visit. In terms of contact names, I do not keep names of people I reach on the phone that have nothing to do with the final contact except for the fact they can refer me to them. Once I utilize their assistance and find the correct contact(s) and establish a relationship with them, there is no reason to keep the secretaries, administrators, receptionists and others in other departments, who I will not need to call again. The key contact names and their direct administrators, if appropriate, are

1

always kept. You have received all of these names that PTP has developed so far and should receive more over the next month or two--as soon as we set a date for the Fall meetings—and I start to set up the new on-site meetings. Both you and Dave will get those as I proceed through this next round of contacts.

More importantly, I am waiting for Dave's feedback and report when he returns from Semicon, and for his opinion on which accounts are the most valuable to pursue for business. As well, we need to set dates for the Fall sales trip, well in advance, now that he and I are qualifying these accounts. Since it was only recently that you have agreed to let Dave come East, there was insufficient reason for PTP to spend weeks on the phone without having an event that PTP could link to a sales effort! That would have damaged our ability to penetrate these accounts, and certainly not have aided in that effort.

Despite Semico's waning support for PTP, PTP's efforts have been consistent since the inception of the Sales Agreement. Of course, there is seasonality in these efforts to match the seasonal buying patterns of our customer base, but on an annual basis, PTP has been spending more time over the last two years to make sales for Semico than previously. This expanded time is due to heightened competition and the fact that the customer base has been shrinking, making it more difficult to find new customers.

Your efforts to criticize PTP's efforts are hypocritical as you continue to erect barriers for PTP to succeed in its business, probably engaging in that behavior so that you can then claim PTP is not performing. As of this writing, Semico has still not re-established PTP contact information on the web site—one of the fastest growing sources for new clients in our industry, Semico officers have told a number of my customers that I am no longer associated with Semico, resulting in them not calling me for business; and you continue to erect policies that make it more difficult for PTP to communicate with the consultants who constitute the basis of what PTP sells.

PTP values this contract and will continue to perform, as it is in PTP's interest to do so. I only hope that you will come to your senses and start supporting, not blocking our efforts.

Sincerely,

Jan-Charles Fine
President
Pro Tem Partners, Inc.

Exhibit   7D

July 20, 2005

**VIA FIRST CLASS US MAIL**
**& EMAIL**

Jan-Charles Fine
Pro Tem Partners
P.O. Box 402
Weston, MA 02493-0003

Dear Jan:

I have your July 13, 2005 letter in which you claim, quite erroneously, to have "previously established the facts, in detail." Your "facts" are largely a product of fabrication in a lame and transparent effort to avoid focusing on the actual cause (i.e., lack of diligent sales efforts, and active withholding of critical information necessary to the development of Semico's marketing efforts and management of its operations) of Pro Tem's deficient performance.

Further, despite clear instructions on numerous occasions that your contact at Semico is to be me, you have chosen to ignore those instructions. You have also elected to ignore Company policies and procedures, including the Performance Improvement Plan issued on May 9. As an illustration of the resulting consequences, there was indeed delay in reimbursement of your travel expenses corresponding with the June visit, along with Sherry Garber, to IBM's Raleigh facilities. As you will recall, you sent your expense report to Shirley Shaw, instead of me. Then, after you finally got around to submitting it to me, it was unsigned and had to be again resubmitted. Semico has always expected you to conform to its policies and procedures, including those relating to expense reimbursement. You, on the other hand, somehow deem yourself exempt, and then have the audacity to whine over the predictable consequences (e.g., delay in expense reimbursement).

Your letter then revisits a theme you have been persistently, albeit misguidedly, been advancing since at least May 2005; namely, that Pro Tem cannot reasonably be expected to do "cold call" work in its territory – unless you are physically accompanied by the appropriate senior analyst from Semico. Consistently, you have even resisted webcast communications among you, the analyst and potential customers – even though when you were finally pressured into participating (as was the case with Joanne Itow, Rohm & Haas and you), a sale resulted. In short, Pro Tem's duties have always included introducing Semico to potential new customers, determining if they are in fact qualified (i.e., represent a meaningful opportunity), and putting them in touch with the correct analyst by telephone or email in order that a meaningful dialogue might ensue – all to be accomplished well before any definitive sales calls with an analyst are scheduled. In other words, you seem to think Pro Tem's market development responsibilities under the Sales Representative Agreement exist only to the extent they are "linked to an event" and your hand is in every instance being held by an on-site analyst. You are flat wrong in that

1

regard; it has always been Semico's reasonable expectation that you have both the ability and obligation, on your own, to make professional sales presentations and to qualify potential accounts. Indeed, if Pro Tem is unwilling or unable to do substantial cold call work, sales presentations, and qualification of accounts prior to Semico having to expend significant sums for face to face conferencing between qualified customers and the analyst, it makes me wonder what Pro Tem is actually doing to earn a commission. While analysts do from time to time assist the sales force in the qualification procedure, particularly in determining whether the potential customer's scope of work is really "up our alley," the primary duty to qualify has always rested with sales personnel.

In your letter, considerable attention is given to the "would be" sales trip that you were supposedly planning for June, then July and now for the Fall. In that regard, I would remind you that during May, I was asking Pro Tem for its list of qualified customers, so Semico could then possibly aid in supplementing the list and determine whether it made economic sense to fly a senior analyst back East – recognizing that during such a trip the analyst would also effectively be unable to devote substantial attention to pending projects at the home office. There was no response from you in that regard until June 21, so there would not have been any reason for the Company to earlier assume that Dave Cavanaugh might actually be needed, in a meaningful capacity, in the East. (I would also remind you that during the first and second week of June, Sherry Garber accompanied you on a trip to visit IBM in Raleigh. Although that trip, effectively initiated by the existing customer – rather than Pro Tem as our sales representative – was on extremely short notice, Semico's quick response plainly demonstrates Company support, as legitimately needed, of marketing efforts in Pro Tem's territory.) Finally, on June 21, Pro Tem produced its list of customers or potential customers that it proposed be visited in July. Of the eleven companies on the list, none was then qualified. So once again, you were effectively seeking to have Semico allocate the resources corresponding with a senior analyst to make cold calls to 11 companies in the East. The point, wholly aside from Pro Tem's inability to even obtain appointments with potential customers at that late date, is that you should have been doing your cold calls and qualification work well before the beginning of July.

Along similar lines, you are flat mistaken that "it was only recently that [I] agreed to let Dave come East." What I agreed to, back in May, was that once you had developed a suitable number of demonstrably qualified accounts in your territory, Semico would make the appropriate analyst available to accompany you on the corresponding sales trip. In terms of your identifying to Semico any specific companies, that are qualified accounts, Semico has heard nothing back from you.

Pro Tem does continue to withhold key information from Semico. For example, in your letter of July 13, you make reference to "the few companies that did not have suitable representation at Semicon." Who are those companies? Who were your contacts with those companies? What was the nature of your contact with them?

Similarly, you will recall Vivianne E. Farmer, the lead at IBM Burlington that was passed on to you by Richard Wawrzyniak on June 21, 2005. Not only did you decline to disclose that

2

lead to me two days later in response to a direct question on the point, you then failed to properly monitor, as Semico's East Coast representative, a followup project for the Design Center Proposal. Since turning this over to you on July 5, I have heard nothing further from you on the matter, although nine days later you sent me an email to the effect that IBM was still considering purchasing the DRAM service. In short, utter silence on the Design Center Proposal. Once again, Semico has been left in the dark, in that fifteen days have passed since the Design Center matter was handed over to you, and you have still not reported in with regard to it.

Yet another illustration of Pro Tem providing mere snippets of information, as distinguished from ongoing information having attendant meaningful specificity, was today's email from you that spoke to an unnamed company with a possible interest in microwave components. There's no way Semico could at the outset make any reasonable response to your inquiry without knowing more, such as the name of the company, its focus, and at least a hint of the potential scope of work. This goes, once again, to your contractual duty to qualify accounts and to keep Semico in the information loop on an ongoing basis.

Further, as I pointed out to you in my email of June 22, 2005, Pro Tem has continued to actively impede the possible acquisition of Semico by Penton, by refusing to provide customer and sales activity information (as generally outlined in the PIP). I understand you subsequently told Sherry Garber that, without Pro Tem's input or help, the Penton deal would not go through. Once again, it is plain that you have an underlying agenda with respect to withholding information, to which Semico is plainly entitled, regarding the Pro Tem territory. Frankly, I'm mystified by your conduct in that regard, since such a calculated withholding cannot be in the best interest of Semico or its shareholders. Perhaps you believe holding Semico information hostage will enhance the price you might realize were there ever be a resumption of discussions involving redemption of your Semico stock. Be assured that maliciously motivated conduct on your part will have the opposite effect.

You also remark in your letter that Semico has not reestablished Pro Tem contact information on the website. That is correct, since that action represented but one of the few countermeasures Semico could employ in response to your wrongful withholding of information.

You also state as follows in your letter:

> Semico officers have told a number of my customers that I am no
> longer associated with Semico, resulting in them not calling me for
> business; . . .

To my knowledge, no Semico officer or employee has communicated to anyone that you are not associated with Semico. In fact, it is you that has been so communicating. As you will recall, when you and Sherry met with Carl Cunningham on your June trip to Raleigh, you announced to Mr. Cunningham that you were not with Semico, but with Pro Tem. Moreover, you handed out one or more business cards that reflected no association whatsoever with Semico. In short, you have disavowed, to at least one key Semico/Pro Tem customer, any association with the Company. Your wish for disassociation has come true, however, in that Semico is now giving

you notice that the Agreement has terminated, effective immediately, pursuant to its Section 7.02. The breaches by Pro Tem of the corresponding material terms of the Agreement are summarized in the next paragraph. Each of those breaches would independently support this termination.

Pro Tem's material breaches that support termination of the Agreement include, without limitation, the following:

1.  Pro Tem has made little, if any, demonstrable progress in developing the demand for, and sale of, Semico services within its territory. Sales in the territory are reflective of that lack of progress. (Violation of Sections 1.05 and 3.01)

2.  Pro Tem has declined to follow Semico policies and procedures, such as the PIP and declining to honor the designation of its contact person at Semico. (Violation of Sections 3.01 and 3.05)

3.  Pro Tem has declined to provide, with any measure of specificity, and on an ongoing basis, reasonably comprehensive information to Semico pertinent to the development of demand for, and for sale of , Semico services within the territory. (Violation of Sections 1.05, 3.01 and 3.05)

4.  Pro Tem has not acted in the best interest of Semico by withholding information belonging to Semico that pertains to the territory, the disclosure of which would facilitate the possible acquisition of Semico by a third party on terms favorable to Semico, and hence to its shareholders. (Violation of Sections 3.01 and 3.05)

Any commissions remaining or becoming due to Pro Tem will be paid in accordance with Sections 4.02 and 6.02. In that connection, you will also be receiving, as required under Subsection 6.01(a), the corresponding listing of accounts each October 1 and April 1 until your commissions have been paid in full.

For the record, in closing, Semico rejects Pro Tem's self-serving and unfounded assertions that Semico has attempted to "set-up" Pro Tem for failure and "has engaged in a range of . . . pernicious behavior." Instead it has been Pro Tem's above-listed breaches, together with apparent complacency and inertia having set in, that has brought us to this unfortunate juncture.

Sincerely,

SEMICO RESEARCH CORP.

_____
Jim Feldhan, President

4